## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### Northern Division

| | |
|---|---|
| **Dr. ANGELA JOSEPH**<br>**1102 Woodside Drive**<br>**Flint, MI 48503,**<br><br>        *Plaintiff,*<br><br>v.<br><br>**ROBERT L. WILKE, SECRETARY**<br>**DEPARTMENT OF VETERANS AFFAIRS**<br>**810 Vermont Ave, NW**<br>**Washington, DC 20420**<br><br>        *Serve*:<br><br>**MATTHEW SCHNEIDER, U.S. ATTORNEY**<br>**EASTERN DISTRICT OF MICHIGAN**<br>**United States Attorney's Office**<br>***Attn***: **Civil Process Clerk**<br>**211 W. Fort Street - Suite 2001**<br>**Detroit, Michigan 48226**<br><br>**WILLIAM BARR**<br>**ATTORNEY GENERAL**<br>**U.S. Department of Justice**<br>**950 Pennsylvania Avenue, N.W.**<br>**Washington, D.C. 20530-0001**<br><br>*Defendant.* | Civil Action No. _____<br><br>**JURY TRIAL DEMANDED** |

## CIVIL COMPLAINT FOR EQUITABLE AND
## MONETARY RELIEF AND DEMAND FOR JURY TRIAL

Plaintiff Dr. Angela Joseph brings this complaint alleging that Defendant subjected her to unlawful discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 on the basis of her race and color and for having engaged in the protected activity of complaining about discrimination and supporting an Equal Employment Opportunity investigation.

## PARTIES

1.      Plaintiff Dr. Angela Joseph is a resident of Flint, Michigan. At all times relevant to this action, Joseph was an employee of the Aleda E. Lutz Veterans Affairs Medical Center, Saginaw, Michigan.

2.      Defendant Robert Wilkie is the Secretary of the Department of Veterans Affairs and has been sued in his official capacity.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1331, because this is an action arising under the laws of the United States, specifically, Title VII of the Civil Rights Act of 1964 42 U.S.C § 2000e–2.

4.      The Court has jurisdiction over this action because Plaintiff has exhausted her administrative remedies under Title VII, and because the United States Equal Employment Opportunity Commission has been processing the matter for more than 180 days since Joseph requested a hearing.

5.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because a substantial number of the employment practices alleged in this action took place within this judicial district at the Aleda E. Lutz Veterans Affairs Medical Center in Saginaw, Michigan.

## FACTUAL ALLEGATIONS

6.      Joseph was born in Dehradun, India and lived there until she was ten years old.

7.      In or about October 2015, Dr. Eiad Kseibi of the Pulmonary, Critical Care and Sleep Medicine department in Detroit, Michigan wrote on behalf of Joseph recommending her for a physician/critical care consultant position at Aleda E. Lutz Veterans Affairs Medical Center in Saginaw, Michigan ("Lutz VAMC").

8.      In or about November 2015, Joseph started working at Lutz VAMC as a physician in its urgent care section and as a hospitalist on the inpatient wards.

9.      On or about September 1, 2016, Joseph was officially hired as a GS-15 full-time staff hospitalist/urgent care physician at the Lutz VAMC. Joseph's direct supervisor was Chief of

2

Medicine, Dr. Anthony Albito.

10.     Sally Lewis, a Caucasian nurse practitioner was the assigned assistant chief of medicine. Lewis supported the mistaken belief that Joseph is black.

11.     Chief of staff Barbara Bates supervised all medical staff, including the nurse practitioners. Bates also formed the mistaken belief that Joseph is black.

12.     Bates supervised a Caucasian nurse manager named Christina Tokarski. Tokarski also formed the mistaken belief that Joseph is black. Nursing administrator Steven Haag stated under oath to an EEOC investigator that Joseph is African-American. Tokarski and nursing staff promoted the mistaken belief that Joseph is black.

13.     Upon information and belief, Tokarski was instrumental in engineering the exit of a black nurse manager of Urgent Care named Archia Jackson. Tokarski stoked the Lutz VAMC patient and nursing staff view that Jackson had violated at patient's Health Insurance Portability and Accountability Act rights, generating a patient complaint that required investigation. Tokarski then assumed Jackson's job as Urgent Care nurse manager after Jackson resigned.

14.     In or about early in 2017, Joseph was involved in a code blue case with Tokarski and two other nurses. During the code blue incident, the nurses failed to follow Joseph's orders and instead suggested incorrect plans for management of the patient.

15.     Subsequent to the incident Mikailu Sorie, a black assistant nurse manager of the Acute Care Telemetry, participated in a special meeting where he was supportive of Joseph, and the Agency reprimanded Tokarski for lying about the patient's condition during this meeting.

16.     Joseph sent an email to Albito discussing the substance of the meeting and the code blue incident, reporting that she was upset that she was not allowed to manage the patient medically because of the nurse's actions.

17.     After the code blue incident, Tokarski began complaining to Haag that Joseph was difficult to work with. Tokarski encouraged a group of Caucasian nurses and technicians, including Misty Jacobs, Carol Little, and Cathy Archibald, to resist when working with Joseph. For example, Tokarski encouraged the nurses to complain to Albito about Joseph and

characterize Joseph as someone who was difficult to work with. Jacobs was promoted within one month of making a false report against Joseph.

18.     Joseph reported the challenges she was having with getting the techs and the nurses to respect her instructions as the attending doctor to Bates, and Bates acknowledged the situation and declared, "oh I know there is a nursing problem, but if you say something to one of them, they all just band together."

19.     Tokarski then prompted an investigation of Joseph for allegedly violating patient Health Insurance Portability and Accountability Act protections. However, video evidence and witnesses Bea Hannah-Foster and Arron LaPonsie proved Tokarski's allegation to be unfounded.

20.     Upon information and belief, in or about November or December 2017, Tokarski moved into a house owned by Lewis.

21.     In or about September 2017, Sorie, who was from Sierra Leonne, was removed from his position.

22.     On or about December 10, 2017, Joseph sent an email to Bates and reported that Lutz VAMC treated Sorie poorly because he was from Sierra Leone. Joseph also verbally complained to Albito about Lutz VAMC's treatment of Sorie and advised that he had been discriminated against on the basis of his national origin and race.

23.     In or around December 2017, a Hispanic nurses-aid named Gabriel Mirelez filed a grievance. Joseph supported Mirelez's grievance, helping Mirelez retain his position. Lewis and Bates were aware that Joseph supported the grievance, as Joseph wrote to Human Resources supporting Mirelez's position.

24.     In or about April 2018, Tokarski was appointed nurse manager of the Acute Care Telemetry unit. After Tokarski became nurse manager, complaints about Joseph's performance began to escalate.

25.     In or around April 2018, Dr. Galina Gladka, who had been working as an intermittent provider, applied for Joseph's position and specifically requested Joseph's shift. Gladka is Caucasian and is a friend of Albito.

26.     Between April and May 2018, Tokarski and Lewis began to monitor Joseph's cases closely. Upon information and belief, the nurses joined together to bring about two performance and conduct complaints against Joseph for two incidents that occurred on or about May 7 and May 8, 2018.

27.     In the first incident, the patient in question was a Lutz VAMC employee who was experiencing chest pain, not a Lutz VAMC patient. The employee was alert, coherent, and speaking with Joseph. Joseph chose to call emergency services. The employee was a civilian, non-veteran patient, and therefore, could not be admitted to the VAMC facility. The employee patient had chest pain not cardiac arrest. Defibrillator pads were made available to Joseph by the Respiratory therapist. Defibrillator protocols disallow a caregiver from administering the treatment to a patient who is not clearly in cardiac arrest because the electrical shock can arrest the heartbeat of a baseline individual. Accordingly, Joseph did not order the use of a defibrillator. Albito and Lewis alleged that while responding, Joseph refused to use a cardiac monitor on a patient complaining of chest pain and other symptoms suggestive of acute coronary syndrome, deviating from suggested American Heart Association Advanced Cardiovascular Life Support Guidelines (ACLS) protocol.  ACLS protocol does not support the use of a defibrillator for acute coronary syndrome. They claimed that Joseph did not listen to the suggestions of the nurses on the team and that afterwards, the nurses and respiratory technicians claimed that they felt intimidated during the debriefing led by Joseph where the nursing and respiratory staff mischaracterized the equipment as a cardiac monitor rather than a rescue device.

28.     In the second incident, Albito and Lewis alleged that Joseph sent a patient with low hemoglobin and potential gastrointestinal bleeding with family members by car to the Ann Arbor VA (AAVA).  Albito and Lewis believed the patient should have been admitted and transferred directly to a local facility or as a direct admit. The patient was discharged by the infusion nurse before Joseph could evaluate him, and Joseph did not see the patient. An independent review later identified the issue in the second instance as a Lutz VAMC system failure.

29.     On or about May 16, 2018, Albito and Lewis submitted a complaint to the Professional Standards Board and asked for an administrative suspension of Joseph's clinical privileges, alleging that Joseph represented an imminent danger to veteran patient safety. Specifically, Albito and Lewis referenced the May 7 and 8 incidents concerning patient care. Albito, Joseph's first line supervisor, did not discuss the cases with Joseph before making the submission to the Professional Standards Board.

30.     Albito did not give Joseph options for corrective action, and Joseph was not told what the complaints were about. Nevertheless, Albito recommended that Lutz VAMC put Joseph on administrative suspension, effectively immediately, and that during the administrative suspension Joseph not be allowed to participate in patient care nor review charts. Albito also advised that Joseph should be advised not to interact with other staff involved with the investigation.

31.     On or about May 21, 2018, Lutz VAMC issued Joseph a letter which administratively suspended Joseph's clinical privileges. Lutz VAMC did not provide Joseph with the materials relied upon for suspending Joseph's medical privileges, nor did it provide Joseph access to the medical records related to these incidents. Joseph had no access to her files and was asked to give explanations for her past cases by memory recall.

32.     On May 23, 2018, Lewis went into the medical chart of the VAMC employee who experienced chest pain and altered the chart to incorrectly record the incident as a code blue. The incident was initially correctly coded as a rapid response. The protocols around responding to a rapid response and a code blue are different. Joseph correctly treated the incident as a rapid response, and by changing the incident to a code blue, Lewis attempted to accuse Joseph of not properly responding to a code blue.

33.     Upon information and belief, Dr. Waterfield regularly made errors in reporting x-ray studies, this is a deviation of medical guidelines. Waterfield is Caucasian and has not had clinical privileges suspended.

34.     Upon information and belief, Dr. Patterson discharged a patient who was having a

heart attack, and he failed to take care of a patient with chronic obstructive pulmonary disease. This is a deviation of medical guidelines. Patterson is Caucasian and has not had clinical privileges suspended.

35.     Upon information and belief, Gladka, who replaced Joseph, failed to respond to a rapid response page on or around July 6, 2018 and no further action was taken against Gladka.

36.     Upon information and belief, Dr. John C. MacMaster was unable to differentiate between cardiac arrest and acute coronary syndrome. MacMaster improperly suggested medical management of a patient with chest pain. MacMaster is Caucasian and has not had clinical privileges suspended.

37.     Upon information and belief, Dr. Nazzareno E. Liegghio, a physician who practices Psychiatry was unable to manage medical conditions of hospitalized veterans. Liegghio is Caucasian and has not had clinical privileges suspended.

38.     Upon information and belief, Dr. Mark G. Greenwell was not considered a competent physician at Lutz VAMC at the time Joseph was suspended. Greenwell was unable to manage a patient with hypoxia or low oxygen levels. Greenwell is Caucasian and has not had clinical privileges suspended.

39.     On or about June 1, 2018, Lutz VAMC conducted a peer review by the Peer Review Board, but it did not provide Joseph with an opportunity to participate in the peer review despite her request to present her case.

40.     On or about August 27, 2018, Joseph was separated from Lutz VAMC by Bates using the probationary status rule just four days before Joseph would have become full time staff.

41.     On or about October 11, 2018, the Appeals Panel Report on the revocation of Joseph's clinical privileges found no substandard care, professional misconduct, or professional incompetency on Joseph's part.

42.     As the result of Defendant's illegal discrimination and retaliation, Joseph has sustained economic damages, damage to her reputation, and mental anguish, and she will continue to sustain damages into the future.

7

## COUNT I
### Discrimination Based on National Origin/Race
### Title VII of Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, *et seq.*

43.     Plaintiff hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

44.     Plaintiff is an "employee" as the term is defined at 42 U.S.C. § 2000e(f).

45.     Defendant is an "employer" as the term is defined at 42 U.S.C. § 2000e(b).

46.     Defendant violated 42 U.S.C. § 2000e-2 by discriminating against Plaintiff, based on her national origin and race, when it suspended her clinical privileges and terminated her employment.

47.     Defendant's stated reasons for suspending her clinical privileges and terminating her were pretext for its unlawful race and national origin discrimination.

48.     Plaintiff has exhausted her administrative remedies.

49.     Plaintiff sustained substantial monetary and non-monetary damages as the result of Defendant's illegal conduct.

## COUNT II
### Retaliation
### Title VII of Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, et seq.

50.     Plaintiff hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

51.     Plaintiff is an "employee" as the term is defined at 42 U.S.C. § 2000e(f).

52.     Defendant is an "employer" as the term is defined at 42 U.S.C. § 2000e(b).

53.     Plaintiff engaged in protected activity under Title VII on December 10, 2017, when Plaintiff sent an email to Bates and reported that Defendant discriminated against Sorie based on his race and national origin, when verbally complained about discrimination Albito, and when Plaintiff supported Gabrielle's grievance.

54.     Defendant violated 42 U.S.C. § 2000e-2 by suspending Plaintiff's clinical privileges and terminating her because she engaged in protected activity under Title VII when

she opposed discriminatory behavior by Defendant.

55.     Defendant's stated reasons for terminating Plaintiff were pretext for its unlawful retaliation.

56.     Plaintiff has exhausted her administrative remedies.

57.     Plaintiff sustained substantial monetary and non-monetary damages as the result of Defendant's illegal conduct.

## PRAYER FOR RELIEF

Based on the foregoing, Joseph respectfully requests that she be awarded the following relief:

a.  Judgment against the Defendant in the amount of economic damages, compensatory damages, liquidated damages, and punitive damages to be determined at trial;

b.  Pre-judgment interest;

c.  Employment, reinstatement, promotion, or other equitable relief;

d.  Economic damages including front pay and back pay;

e.  Compensatory damages;

f.  Punitive damages;

g.  Interest due on unpaid wages;

h.  Reasonable attorneys' fees and costs of this action; and

i.  Any other relief this Court deems just and proper to award.

## DEMAND FOR JURY TRIAL

Joseph demands a trial by jury for any and all issues proper to be so tried.

Respectfully Submitted,

R. Scott Oswald
The Employment Law Group, P.C.
888 17th St. NW, 9th floor
Washington, D.C. 20006
(202) 261-2838
(202) 261-2835 (facsimile)
SOswald@employmentlawgroup.com
*Counsel for Plaintiff Angela Joseph*