UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DR. ANGELA JOSEPH,

      Plaintiff,                    Civil No. 19-10828

v.                             Honorable Judith E. Levy

ROBERT L. WILKIE, Secretary,
Department of Veterans Affairs,

      Defendant.

**PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

John T. Harrington
Kellee B. Kruse
R. Scott Oswald
The Employment Law Group, P.C.
888 17th Street, N.W., Suite 900
Washington, D.C. 20006
(202) 261-2830 (telephone)
(202) 261-2835 (facsimile)
tharrington@employmentlawgroup.com
kkruse@employmentlawgroup.com
soswald@employmentlawgroup.com

David L. Haron
Hoyer Law Group, PLLC
30300 Northwestern Hwy., Ste 115
Farmington Hills, MI 48334
248-762-7009 (telephone)
800-651-2502 (facsimile)

*Attorneys for Plaintiff*

## <u>TABLE OF CONTENTS</u>

Table of Authorities ................................................................................................ iv

Exhibit List ............................................................................................................. v

Introduction and Summary of Argument .............................................................. 1

Plaintiff's Statement of Material Facts in Dispute .............................................. 2

    A.  Joseph began working for the VA in June 2012 and her probationary period
       Began on June 29, 2016; prior to her separation, she had never been disciplined,
       had never been the subject of a patient complaint, and her last pre-separation
       evaluation said she had a "positive attitude" and her clinical and technical
       skills were good ............................................................................................ 2

    B.  Joseph's treatment of Patient 1 met the Standard of Care, as reflected in the VA's
       final determination regarding this case .......................................................... 3

    C.  Joseph's treatment of Patient 2 met the Standard of Care, as reflected in the VA's
       final determination regarding this case .......................................................... 6

    D.  Joseph's treatment of Patient 3 met the Standard of Care, as reflected in the VA's
       final determination regarding this case .......................................................... 9

    E.  The Summary Review Board that recommended Joseph's separation did not include
       any member with expertise similar to Joseph's (as a hospitalist) and wrongly
       included a Nurse Practitioner who participated in its deliberations ................ 10

    F.  The VA violated its own formal Peer Review process by soliciting a "curbside
       consult" from one of its Ann Arbor physicians regarding the cases involving
       Patients 1 and 2 ............................................................................................ 12

    G.  The VA's final determination regarding the cases involving Patients 1, 2, and 3,
       performed by a panel comprised of a Lutz primary care doctor and two hospitalists
       at another VA facility, was that all three cases met the Standard of Care ........ 13

    H.  The white nurses at Lutz, led by Christina Tokarski and assisted by Lewis, made
       false accusations and targeted Joseph because of her race and color ............... 13

    I.  Joseph engaged in Title VII protected activity when she spoke out on behalf of
       Mikailu Sorie ............................................................................................... 17

    J.  Joseph engaged in Title VII protected activity when she participated in an
       investigation and spoke on behalf of Gabriel Mirelez.. ................................. 18

K.  Joseph was replaced by a white physician, Dr. Galina Gladka, though the VA claims Gladka only filled an "equivalent" position.................................................................... 19

L.  Joseph made reasonable efforts to mitigate her economic damages, but the suspension of her clinical privileges by Lutz severely limited her options...... ................20

Standard of Review.................................................................................................................20

Argument ................................................................................................................................21

A.  Joseph, with the disputed facts viewed in the light most favorable to her, has demonstrated prima facie cases of race and national origin discrimination ...............................................................................................................21

B.  Joseph, with the disputed facts viewed in the light most favorable to her, has demonstrated a prima facie case of retaliation ..........................................................23

C.  The VA is not entitled to summary judgment regarding Joseph's economic damages.......................................................................................................................25

Conclusion.…..........................................................................................................................25

Certificate of Service ............................................................................................................27

# TABLE OF AUTHORITIES

## CASES

*Allen v. Braithwaite*,
  2020 WL 3977671 (W.D. Tenn. 2020) ................................................... 23

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ............................................................................ 21, 22

*Bostock v. Clayton Cty., Ga.*,
  140 S. Ct. 1731 (2020) ............................................................................. 22

*Chattman v. Toho Tenax Am., Inc.*,
  686 F.3d 339 (6th Cir. 2012) .......................................................... 22, 23, 24

*Coffman v. United States Steel Corp.*,
  185 F. Supp. 3d 977 (E.D. Mich. 2016) ............................................. 22, 24

*Idemudia v. J.P. Morgan Chase*,
  434 F. App'x 495 (6th Cir. 2011) ........................................................... 22

*Laster v. City of Kalamazoo*,
  746 F.3d 714 (6th Cir. 2014) .................................................................. 22

*Leilei Lin v. Henry Ford Health Sys.*,
  2020 WL 2112351 (E.D. Mich. May 4, 2020) ........................................ 25

*McDonnell Douglas Corp. v. Green*,
  411 U.S. 792 (1973) ................................................................................ 22

*Staub v. Proctor Hospital*,
  562 U.S. 411 (2011) ................................................................................ 23

*Wingo v. Michigan Bell Tel. Co.*,
  815 F. App'x 43 (6th Cir. 2020) ....................................................... 24, 25

## STATUTES AND RULES

42 U.S.C. § 2000e–2(a)(1) ............................................................................ 22
42 U.S.C. § 2000e–3(a) ................................................................................. 25

Rules

Fed. R. Civ. P. 56(c) .................................................................................... 21
Fed. R. Civ. P. 56(e) .................................................................................... 21

**Exhibit list**

Ex. 1 – Defendant's Numbered Statement of Material Facts

Ex. 2 – Deposition transcript of Angela Joseph

Ex. 3 – June 29, 2016 Board Action

Ex. 4 – October 13, 2016 VA Memo

Ex. 5 – 30(b)(6) Deposition transcript (Savino)

Ex. 6 – Deposition transcript of Anthony Albito

Ex. 7 – Deposition transcript of Sally Lewis

Ex. 8 – Deposition transcript of Mikailu Sorie

Ex. 9 – Deposition transcript of Cathy Archambault

Ex. 10 – Angela Joseph Proficiency Report

Ex. 11 – Deposition transcript of Barbara Bates

Ex. 12 – Joseph's notes re: Patient 1

Ex. 13 – July 30, 2018 Presentation by Joseph to SRB

Ex. 14 – October 26, 2018 Appeal findings

Ex. 15 – Joseph's notes re: Patient 2

Ex. 16 – Joseph's notes re: Patient 3

Ex. 17 – Portion of medical records re: Patient 3

Ex. 18 – Portion of Joseph's response re: Patient 3

Ex. 19 – Deposition transcript of William Trimble.

Ex. 20 – May 10, 2018 Lewis email

Ex. 21 – May 21, 2018 notification re: suspension of privileges

Ex. 22 – July 9, 2018 notification re: SRB

Ex. 23 – Deposition Transcript of John MacMaster

Ex. 24 – July 16, 2018 notification re: SRB

Ex. 25 – July 31, 2018 emails

Ex. 26 – August 1, 2018 email

Ex. 27 – July 30, 2018 letter

Ex. 28 – August 3, 2018 Separation notification

Ex. 29 – June 19, 2018 email

Ex. 30 – Deposition transcript of Christina Tokarski

Ex. 31 – Portion of Joseph EEO interview/affidavit

Ex. 32 – Anthony Albito EEO Affidavit

Ex. 33 – Deposition transcript of Misty Lauria

Ex. 34 – September 5, 2018 emails

Ex. 35 – Interview Summary

Ex. 36 – December 10, 2017 email

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Dr. Angela Joseph began working for the VA in 2012 and became a full-time

probationary employee on June 29, 2016, with her probationary period ending on June 29, 2018.

Prior to her separation, she had never been disciplined or the subject of a patient complaint; and

she was qualified for her position as a hospitalist at Lutz and fulfilling the requirements of that

position. She was hard working and dedicated and her last pre-separation evaluation noted that

she had demonstrated a positive attitude and her clinical and technical skills were deemed good.

But Joseph, because she was nonwhite and of Indian national origin, was targeted by a

clique of white nurses, led by Christina Tokarski and abetted by Sally Lewis, with a series of

complaints and Reports of Contact based on false allegations regarding Joseph's decisions and

actions in treating patients. Joseph's vocal support of two nonwhite nurses also targeted by these

white nurses added retaliatory animus to the ongoing discriminatory animus of the white nurses.

The targeting of Joseph culminated in false allegations regarding Joseph's care of three

patients, referred to here and in the VA's motion for summary judgment as Patients 1, 2, and 3.

Joseph's supervisors, rather than subjecting these cases to non-disciplinary Peer Review,

deviated from the VA's policies to subject the cases, and Joseph, to a Summary Review Board

that was improperly comprised of members without similar expertise to Joseph's as a hospitalist,

and improperly included a Nurse Practitioner. Relying on the false allegations of the white

nurses, and disregarding Joseph's reasonable explanations for her treatment decisions, the Board

recommended Joseph's separation, and Joseph's supervisors accepted the recommendation.

Following Joseph's separation, and in the VA's final determination as to whether that

separation resulted from substandard care, professional misconduct or professional

incompetence, a properly comprised panel of a primary care doctor from Lutz and two

hospitalists from another VA facility found nothing to support such findings and determined that all three cases met "the Standard of Care." While this finding did not affect or overturn Joseph's separation, it demonstrates that, at worst, her handling of the three cases involved reasonable judgments with which some might disagree but which an unbiased review by the Board should have found, as in the VA's final determination, met the Standard of Care.

The VA's motion for summary judgment should be denied. Joseph has established her *prima facie* cases of national origin and race discrimination, and retaliation, in violation of Title VII, and has strong indirect evidence of the VA's discriminatory intent and retaliatory animus.

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN DISPUTE[1]

**A. Joseph began working for the VA in June 2012 and her probationary period began on June 29, 2016; prior to her separation, she had never been disciplined, had never been the subject of a patient complaint, and her last pre-separation evaluation said she had a "positive attitude" and her clinical and technical skills were good.**

Joseph worked at Lutz from June 2012 to February 2013 in "a staff position." Ex. 2, Dep. of Angela Joseph at 19:8-21:3. She left Lutz in February 2013 to work at a private hospital; she left that facility in December 2013 to work at the Detroit VA as a full-time fee-based physician. Ex. 2 at 21:4-23:11. She returned to Lutz in November 2015, working in urgent care as a fee-based physician. Ex. 2 at 19:8-21:3. Joseph was appointed as full-time staff at Lutz on June 29, 2016 and her full-time service should be counted from that date. Ex. 2 at 131:15-20. A June 28, 2016 VA "Board Action," signed by Albito and Bates (on June 29, 2016), "recommend[ed]

---

[1]     Attached as Exhibit 1 is Defendant's Statement of Material Facts, altered only to individually number each proffered fact. Joseph does not dispute the VA's proffered facts numbered 80-90, 95-98, 101, 106-07, 112, 114-21, 123-24, 126, 131-34. She disputes facts 1 and 2 regarding Joseph's probationary status. She disputes facts 3-79 as they incompletely and inaccurately describe Joseph's treatment of Patients 1, 2, and 3. She disputes facts 91-94 and 108-11 regarding the characterization of Schildhouse's review. She disputes facts 135-43 regarding the characterization of her support for Sorie and Mirelez.

[Joseph] be appointed, credentialed and privileged as a full-time, permanent staff physician." Ex. 3. Because Joseph was given full-time status as of June 29, 2016, she was not a probationary employee after June 29, 2018. Ex. 2 at 381:18-383:5. In an October 13, 2016 memo, the VA claimed that the "Board Action for permanent appointment, dated 06/28/2016 was deemed inappropriately" and "should have indicated that she was to be appointed temporary." Ex. 4. The VA's 30(b)(6) designee, Steven Savino, was unaware of any other instance in which such an "error" had occurred. Ex. 5, 30(b)(6) Dep. (Savino) at 47:21-48:7.

Prior to her separation, Albito never disciplined, warned, or counseled Joseph; and she was qualified for her position and fulfilling the requirements of a hospitalist. Ex. 6, Dep. of Anthony Albito at 40:1–15. Joseph was never the subject of a complaint by a patient. Ex. 6 at 72:19–73:3. Albito, Lewis, Sorie, and Archambault testified that they never observed Joseph using inappropriate or unprofessional language. Ex. 6 at 67:19–24; Ex. 7, Dep. of Sally Lewis at 15:23-16:2; Ex. 8, Dep. of Mikailu Sorie at 14:18-16:15; Ex. 9, Dep. of Cathy Archambault at 13:22-14:6. Joseph was hard-working and dedicated. Ex. 7 at 104:2-3. Joseph's performance evaluation for the period ending September 30, 2017, was completed by Albito and signed by Bates as the approving official. Ex. 10. As of September 2017, as documented in her evaluation, Joseph had demonstrated a positive attitude for patients, hospital staff, and other members of the medical staff; and her clinical and technical skills had been observed by her peers and were deemed to be good. Ex. 10; Ex. 11, Dep. of Barbara Bates at 121:20-123:11.

**B. Joseph's treatment of Patient 1 met the Standard of Care, as reflected in the VA's final determination regarding this case.**

Patient 1, a 67-year-old male, was brought to the Lutz urgent care clinic by a neighbor on April 30, 2018, for confusion, frequent falls, and because he was unable to care for himself. Ex. 2 at 265:5:23-267:13; Ex. 12; Ex. 13. That day, a hospitalist, Dr. Patterson, suggested Patient 1

3

be discharged; no CT head scan was done, despite a history of frequent falls. Ex. 2 at 268:14-23; Ex. 12; Ex. 13. On May 1, 2018, a nurse from Lutz visited Patient 1 at his home. Ex. 2 at 268:24-270:1; Ex. 12; Ex. 13. Patient 1 should have been admitted at that time; "he needed to be worked up." Ex. 2 at 268:24-270:1; Ex. 12; Ex. 13. On May 2, 2018, Patient 1 returned to Lutz's urgent care but only saw a social worker. Ex. 2 at 268:24-270:1; Ex. 12; Ex. 13. On May 4, 2018, Patient 1 again returned to Lutz and was admitted by the urgent care physician, Dr. Brooks, for dementia and an elevated ammonia level. Ex. 2 at 270:17-272:1; Ex. 12; Ex. 13. Patient 1 should have been placed on a CPAP at this point; and a variety of drugs could have been administered to decrease the ammonia level—but none were given. Ex. 2 at 270:17-272:1; Ex. 12; Ex. 13. On May 5, 2018, Joseph reviewed Patient 1's records and noted he was less alert and oriented, the ammonia level remained high, and nothing was being done to address it. Ex. 2 at 272:9-21; Ex. 12; Ex. 13. Joseph's notes said that no arterial blood gas (ABG) testing had been done, and that most physicians would have ordered ABG testing at this point. Ex. 2 at 272:9-21; Ex. 12; Ex. 13.

On May 6, 2018, Joseph noted that Patient 1 still had not been treated for elevated ammonia levels; no CPAP had been tried; no ABGs had been taken; and there still had not been a CT. Ex. 2 at 272:22-273:14; Ex. 12; Ex. 13. Joseph, in her notes, wrote, "Basically, the patient just sat in the room all weekend with the anticipation that he would be sent to a nursing home on Monday." Ex. 2 at 272:22-273:14; Ex. 12; Ex. 13. On May 7, 2018, Joseph began her shift at 7:00 a.m. and first saw Patient 1 at 7:45 a.m.; he was asleep and Joseph did not examine him at that time. Ex. 2 at 273:15-276:15; Ex. 12; Ex. 13. She then went to "the morning huddle," during which she was told that the nurses were preparing to transfer Patient 1 to a nursing care or an assisted care living facility. Ex. 2 at 273:15-276:15, 279:6-281:8; Ex. 12; Ex. 13. Joseph saw Patient 1 after the morning huddle at 2:30 p.m.; she spoke with him and conducted a full exam

"from head to toe." Ex. 2 at 273:15-276:15; Ex. 12; Ex. 13. Joseph also ordered Lactulose, a

drug to reduce and normalize ammonia levels. Ex. 2 at 273:15-276:15; Ex. 12; Ex. 13. After the

morning huddle and until 2:30 p.m., Joseph was seeing other patients. Ex. 2 at 276:16-23; Ex.

12; Ex. 13. Patient 1 had been Joseph's responsibility for only about eight hours (from 7:00 a.m.

to about 2:30 or 3:00 p.m.). Ex. 2 at 277:16-279:5; Ex. 12; Ex. 13. At 4:15 p.m., Joseph notified

"Respiratory" of the need for immediate ABGs. Ex. 2 at 279:6-281:8; Ex. 12; Ex. 13. Joseph also

ordered BiPAP but wanted the ABGs before she placed Patient 1 on BiPAP. Ex. 2 at 279:6-

281:8; Ex. 12; Ex. 13. The ABGs were back at 5:30 p.m. and showed that Patient 1 had high

carbon dioxide levels; he was in "permissive hypercapnia" and his carbon dioxide and bicarb

levels "were very high," which indicates a chronic condition and that Patient 1 "was

decompensating fast." Ex. 2 at 281:9-282:24; Ex. 12; Ex. 13. In the meantime, Joseph "was

trying to make an arrangement to ship him out." Ex. 2 at 281:22-282:24; Ex. 12; Ex. 13. After

the ABGs were back, Patient 1 was taken for a head CT, which Joseph had already ordered. Ex.

2 at 281:22-282:24; Ex. 12; Ex. 13. Joseph's notes say the following: "I came to the office and

ordered ABGs, BiPAP, CT head and EKG, and I placed a call to the AOD to connect me with

Covenant Hospital and supervising nurse to plan for transfer of this patient out of facility." Ex. 2

at 281:22-282:24; Ex. 12; Ex. 13. While Joseph planned to transfer Patient 1 before she had test

results, she wanted to perform them to better inform the receiving facility. Ex. 2 at 282:25-

283:23; Ex. 12; Ex. 13. Joseph notes indicate that, at 5:44 p.m. on May 7, 2018, there was a

"failed trial of BiPAP - the patient refused the mask; he was anxious. Ex. 2 at 286:1-287:3; Ex.

12; Ex. 13. Joseph wrote, "Will transfer patient to Saginaw for hypercapnia with hypoxia

requiring intubation." Ex. 2 at 286:1-287:3; Ex. 12; Ex. 13. Joseph discussed the case with Lewis

and Lewis agreed with Joseph, saying "Go ahead." Ex. 2 at 287:4-7.

The VA's final determination regarding this case was that there were no findings to support substandard care, professional incompetence or professional misconduct and "the Standard of Care was met." Ex. 14.

**C. Joseph's treatment of Patient 2 met the Standard of Care, as reflected in the VA's final determination regarding this case.**

Patient 2 came to Lutz's urgent care with low hemoglobin. Ex. 2 at 33:21-36:24; Ex. 13; Ex. 15. Patient 2 had a form of leukemia and also needed frequent blood transfusions because of gastrointestinal (GI) bleeding. Ex. 2 at 297:4-298:7; Ex. 13; Ex. 15. Patient 2, prior to May 7, 2018, had a series of blood transfusions at Lutz in March, April, and May, 2018. Ex. 2 at 298:8-299:2; Ex. 13; Ex. 15. The urgent care physician, who is white, called Joseph and said that Patient 2 needed to be admitted for a blood transfusion. Ex. 2 at 33:21-36:24; Ex. 13; Ex. 15. Joseph had already reviewed Patient 2's chart and spoken with him and knew he did not want to be admitted, and suggested he be brought to the infusion clinic and given blood products. Ex. 2 at 33:21-36:24; Ex. 13; Ex. 15. The urgent care physician disagreed. Ex. 2 at 33:21-36:24; Ex. 13; Ex. 15. Albito told Joseph to admit the patient, which Joseph did, and gave him two units of blood. Ex. 2 at 33:21-36:24; Ex. 13; Ex. 15. Joseph then talked to Lewis about Patient 2; Lewis said, "Dr. Albito is trying to protect you.  The physician that you're dealing with was a former chief over here, and the nurses will all follow her, and she is white and you are not." Ex. 2 at 33:21-36:24; Ex. 13; Ex. 15. On May 7, 2018, Joseph was managing Patient 1 and Patient 2 at the same time. Ex. 2 at 296:20-297:3; Ex. 13; Ex. 15.

Joseph first interacted with Patient 2 at about 1:00 p.m. on May 7, 2018; she "visualized him, but [she] did not examine him." Ex. 2 at 299:10-303:4; Ex. 13; Ex. 15. Joseph discussed admitting Patient 2 with the infusion care nurse, Andrea Jimenez, and they decided Patient 2 would get his blood products and Joseph would then evaluate him and "decide what to do with

6

him." Ex. 2 at 299:10-303:4; Ex. 13; Ex. 15. Per VA policy, the infusion clinic was "nurse

managed." Ex. 2 at 327:10-328:5. Between 4:00 and 6:00 p.m. on May 7, 2018, Joseph was very

occupied with Patient 1, who was in respiratory crisis; Patient 1 was her priority. Ex. 2 at 306:16-

23; Ex. 13; Ex. 15. Joseph and Dr. Malloy, Patient 2's primary care doctor, ordered a GI consult

for Patient 2's May 11, 2018 appointment. Ex. 2 at 305:22-306:11; Ex. 13; Ex. 15. Joseph told

Patient 2 that she was trying to get him into the GI clinic at the Ann Arbor VA; she needed a GI

consult first. Ex. 2 at 305:22-306:11; Ex. 13; Ex. 15.

When Joseph finished treating Patient 1, she "came running up to see Andrea [Jimenez]"

regarding Patient 2. Ex. 2 at 307:14-308:19; Ex. 13; Ex. 15. Jimenez told her that Patient 2 had

gone home. Ex. 2 at 307:14-308:19; Ex. 13; Ex. 15. "[T]hat really worried [Joseph], so then [she]

called the patient at home." Ex. 2 at 307:14-308:19; Ex. 13; Ex. 15. The general protocol was

that the nurse could discharge the patient or call someone else if the hospitalist was busy. Ex. 2 at

307:14-308:19; Ex. 13; Ex. 15. But "the nurse should have waited" until Joseph examined

Patient 2. Ex. 2 at 307:14-308:19; Ex. 13; Ex. 15. Joseph had told Jimenez, "Make sure I see the

patient before he leaves." Ex. 2 at 308:22-309:13; Ex. 13; Ex. 15.

When Joseph called Patient 2's home, his wife said he "feeling good." Ex. 2 at 311:5-

312:19; Ex. 13; Ex. 15. Joseph told Patient 2 to either return to Lutz or go to the nearest hospital.

Ex. 2 at 311:5-312:19; Ex. 13; Ex. 15. Patient 2 said, "I feel fine . . . and I'll see you tomorrow."

Ex. 2 at 311:5-312:19; Ex. 13; Ex. 15. Joseph again advised him to return to Lutz or go

somewhere else immediately. Ex. 2 at 311:5-312:19; Ex. 13; Ex. 15.

Patient 2 returned to Lutz on May 8, 2018, for another transfusion. Ex. 2 at 312:20-

314:12; Ex. 13; Ex. 15. Joseph told Jimenez again to "hold" Patient 2. Ex. 2 at 322:9-25; Ex. 13;

Ex. 15. Joseph said, emphatically, "This time definitely do not let him go." Ex. 2 at 322:9-25;

Ex. 13; Ex. 15. On May 8, 2018, Joseph did not interact with Patient 2 or his family because she was involved with another patient. Ex. 2 at 323:15-325:18; Ex. 13; Ex. 15. The nurse did not mention "rusty stool" to Joseph on May 8, 2018; if she had, Joseph "would have gone and seen the patient." Ex. 2 at 323:15-325:18; Ex. 13; Ex. 15. If Joseph had seen Patient 2 on May 8, 2018, she "would have arranged for transport" by ambulance to a facility in Ann Arbor. Ex. 2 at 326:15-24; Ex. 13; Ex. 15. But Jimenez told Patient 2 that his family should take him to the Ann Arbor VA ER; Joseph learned that only after she finished with her other patient and spoke to Jimenez. Ex. 2 at 330:19-331:10; Ex. 13; Ex. 15. Joseph called the Ann Arbor ER between 7:00 p.m. and 9:00 p.m. and confirmed that Patient 2 had arrived. Ex. 2 at 332:2-333:24; Ex. 13; Ex. 15. Patient 2 was admitted at the Ann Arbor VA and died a month later. Ex. 2 at 334:16-20.

The following was not disputed by the SRB: Joseph did not see Patient 2 until May 7 and Patient 2 had previously been receiving treatment for months; many providers saw Patient 2 and had no answers; Patient 2 had been in for multiple blood transfusions and needed a higher level of care due to multiple chronic issues." Ex. 23 at 45:17-20. MacMaster is not aware of any documentation that Joseph ever instructed the clinic to release Patient 2 or decided that he should travel to Ann Arbor in a personal vehicle. Ex. 23 at 46:21-48:6. Albito is not aware of anything that shows the nurse consulted Joseph about an earlier transfer. Ex. 6 at 106:11-109:5. Albito agreed that the nurse "definitely" should have consulted with Joseph before instructing Patient 2's family to take him to another facility; and if Joseph was not notified by the nurse, "that would be a concern." Ex. 6 at 110:25-111:22.

The VA's final determination regarding this case was that there were no findings to support substandard care, professional incompetence or professional misconduct and "the Standard of Care was met," though there was a "Systems Issue." Ex. 14.

**D.  Joseph's treatment of Patient 3 met the Standard of Care, as reflected in the VA's final determination regarding this case.**

Patient 3 was a VA dental clinic employee at Lutz who had chest pain while at work. Ex. 2 at 341:1-22; Ex. 13; Ex. 16; Ex. 17; Ex. 18. Joseph and ACT nurse Cheryl Hirn were the first "Rapid Responders" to arrive at the dental clinic. Ex. 2 at 342:3-25; Ex. 13; Ex. 16; Ex. 17; Ex. 18. A standby monitor, which has a blood pressure cuff and pulse oxygen but not a cardiac monitor, was attached to Patient 3. Ex. 2 at 352:5-24; Ex. 18. Patient 3's oxygen levels were good and she was alert. Ex. 9 at 17:19-19:1. Joseph agreed that a Code Blue should be called, and 911 should be called. Ex. 9 at 18:6-17. Archambault and Hirn said an AED should be attached to Patient 3. Ex. 2 at 353:21-355:14; Ex. 13; Ex. 16; Ex. 17; Ex. 18. Joseph, who has managed over 2,000 Code Blue or Rapid Response situations, said "what they gave me were not EKG leads, but defibrillation pads;" they wanted Joseph to use the AED "incorrectly." Ex. 2 at 353:21-355:14; Ex. 13; Ex. 16; Ex. 17; Ex. 18; Ex. 6 at 178:18-179:3. To use the AED as a monitor, certain preparatory steps needed to be taken but had not been done. Ex. 2 at 355:15-356:25; Ex. 13; Ex. 16; Ex. 17; Ex. 18. When Archambault handed the defibrillation pads to Joseph and said, "Let's attach these on and we can monitor," Joseph said, "No" because the preparatory steps had not been taken. Ex. 2 at 355:15-356:25; Ex. 13; Ex. 16; Ex. 17; Ex. 18.

Dr. William Trimble, an African American who is the Chief of Dental Service, came to where Patient 3 was being treated and recalls "some concern" between Joseph and others about whether there should have been "EKG leads placed on [Patient 3] or something of that nature." Ex. 19, Dep. of William Trimble at 9:9-10:1, 12:23-15:13. Joseph was calm; she did not speak disrespectfully to anyone on the team or attempt to prevent them from discussing treatment options. Ex. 19 at 16:17-17:12. In a May 10, 2018, email to Bates and Albito, Lewis made multiple misrepresentations, intended to reflect negatively on Joseph, about information provided

9

to her by Trimble, including that he asked Lewis "why they did not hook [Patient 3] up to a monitor." Ex. 20. Trimble, after reviewing the email, said, "[T]his does not look like what I said at all;" Trimble did not ask Lewis why the team had not hooked Patient 3 up to a monitor. Ex. 19 at 27:11-30:11; Ex. 20. Per ACLS guidelines and protocols, use of a monitor is not mandatory when initially evaluating someone with chest pain. Ex. 6 at 99:22-100:24; Ex. 16 p. 703.

The VA's final determination regarding this case was that there were no findings to support substandard care, professional incompetence or professional misconduct and "the Standard of Care was met." Ex. 14.

### E. The Summary Review Board that recommended Joseph's separation did not include any member with expertise similar to Joseph's (as a hospitalist) and wrongly included a Nurse Practitioner who participated in its deliberations.

On July 9, 2018, Joseph was notified, in a letter from Dr. John MacMaster, that a Summary Review Board (SRB) would be held to review allegations listed in a May 21, 2018, notification to Joseph of the suspension of her clinical privileges. Ex. 21; Ex. 22. MacMaster, a primary care physician, was appointed the head of Joseph's Summary Review Board. Ex. 23, Dep. of John MacMaster at 9:13-10:15, 11:19-12:5. MacMaster had never before been on an SRB, received no training regarding how to conduct an SRB, and did not review policies regarding how to conduct an SRB. Ex. 23 at 11:19-12:5. MacMaster sent essentially the same letter on July 16, 2018, changing the date of the Board meeting to July 30, 2018. Ex. 24. Both letters from MacMaster also said, "If an **initial determination** is made by the [Board] that the reason(s) for your separation and subsequent revocation of privileges resulted from substandard care, professional misconduct or professional incompetence, you will be given an opportunity for a fair hearing and appeal to determine whether or not the reason(s) for the revocation of your privileges should be reported to the National Practitioner Data Bank (NPDB) . . . If a **final**

10

**determination** is made that the revocation did result from substandard care, professional misconduct or professional incompetence, the revocation (and the summary suspension of your privileges, if applicable) will be reported to the [NPDB]." Ex. 22; Ex. 24 (emphasis added).

A Summary Review Board of a physician must have at least three members, the members must be physicians, and "at least one of them should have expertise similar to the person being reviewed." Ex. 11 at 21:24-22:25. Joseph's SRB was comprised of three white male doctors (MacMaster, a family practice physician; Nazzareno Liegghio, a psychiatrist; and Mark Greenwell, a family practice physician) and one white female family practice Nurse Practitioner, Virginia Roland. Ex. 2 at 388:13-389:6; Ex. 23 at 21:16-23, 23:1-24:17. There was no hospitalist (Joseph's specialty) on the Board. Ex. 23 at 24:18-22.

When the Board met on July 30, 2018, Roland, the Nurse Practitioner, participated in the Board meeting and asked questions. Ex. 23 at 27:13-28:11. MacMaster and the Board factored in Roland's opinions when making the final decision of the SRB. Ex. 23 at 35:5-9. MacMaster agreed that it was "possible" the Board could have come a different conclusion if the fourth member of the board had been a physician. Ex. 23 at 35:19-23. On July 31, 2018, Edward Graham, an HR specialist, emailed Stanley Weller, a VA employee relations specialist, and asked, "Have we ruined the SRB process by having a nurse practitioner on the Board? Can we salvage the process if the NP does not sign as a member?" Ex. 25. On August 1, 2018, Graham emailed Roland, stating, in part, the following: "SRB members must be at the same grade and level or higher than the employee being reviewed. Since the Board still had three qualifying members, the recommendation reached remains valid; however, you will not be asked to sign the board action form." Ex. 26. It was an error to have Roland on the board; she did not meet the criteria for being a member of the board. Ex. 23 at 34:2-10; Ex. 11 at 23:1-24:20.

A "Board Action" dated July 30, 2018 said the Board was recommending Joseph's removal based on conclusions that she had "exercised poor medical judgment" in the cases involving Patients 1, 2, and 3. Ex. 27. In a letter dated August 3, 2018, Bates notified Joseph that Bates had accepted the Board's recommendation. Ex. 28. The letter again notified Joseph of her right to "a final determination" following a "fair hearing and appeal" regarding reporting to the NPDB. Ex. 28. There have been no instances, other than Joseph's, in which Bates was involved in removing a physician for reasons of clinical competence. Ex. 11 at 17:11-19:3.

**F. The VA violated its own formal Peer Review process by soliciting a "curbside consult" from one of its Ann Arbor physicians regarding the cases involving Patients 1 and 2.**

Prior to the SRB, the VA asked Dr. Richard Schildhouse, Section Chief, Hospital Medicine, at the VA Ann Arbor Healthcare System, to review the cases involving Patient 1 and Patient 2. Ex. 29. On June 19, 2018, Schildhouse emailed Bates with conclusions he had reached regarding his chart review of the two cases. Ex. 29. For Patient 1, Schildhouse wrote, "I would give this a 3 using the peer review system metric;" and for Patient 2, he wrote, "the care given appears to be a level 3." Ex. 29. Peer reviews result in findings of Level 1 ("most providers would do the same management"), Level 2 ("some providers will do it differently, some will do the same"), or Level 3 ("all providers would do it differently"). Ex. 6 at 126:6-18. Level 1, 2, and 3 designations are **only used in the context of peer reviews**. Ex. 6 at 137:25-138:4 (emphasis added). Joseph considered Schildhouse's review equivalent to a "peer review," even though Schildhouse is not part of the formal peer review system at Lutz. Ex. 2 at 245:7-247:22. Bates said Schildhouse's review "was not a formal process" and was more of "a curbside consult." Ex. 11 at 69:5-70:4. She said there are no policies or procedures regarding this type of informal

outside review or when it should be used; and she had used an outside review in only one other

instance. Ex. 11 at 69:5-70:4.

**G. The VA's final determination regarding the cases involving Patients 1, 2, and 3, performed by a panel comprised of a Lutz primary care doctor and two hospitalists at another VA facility, was that all three cases met the Standard of Care.**

Joseph exercised her right to a "fair hearing and appeal" regarding reporting to the

NPDB, and the results of that hearing and appeal were sent to Bates and Albito on October 26,

2018 by the Chairperson of the panel, Gregory Trudell, a primary care doctor at Lutz. Ex. 14.

The panel was comprised of Trudell; and Doctors Jambunathan Ramanathan and Abdo Alward,

both hospitalists at the VA's John D. Dingell VA Medical Center. Ex. 14.

Each of the panel members reviewed the same three cases reviewed by the SRB "independently

prior to October 11, 2018;" met with Joseph; presented concerns and questions to her during the

review meeting; and Trudell interviewed "several staff members" at Lutz "for clarification of

information" provided by Joseph, and then shared the results of those interviews with the other

two panel members. Ex. 14.  The panel members "unanimously agreed that Dr Joseph's clinical

privileges based on the above cases do not warrant revocation. **There were no findings during**

**this review to support substandard care, professional incompetence or professional**

**misconduct**. Therefore, no report to the [NPDB] or State Medical Board is required." Ex. 14

(emphasis added). For all three cases, the panel said "the Standard of Care was met;" and if the

cases were a Peer Review, the cases involving Patients 1 and 3 would be Level 1; and the case

involving Patient 2 would be Level 2 (Systems Issue). Ex. 14.

**H. The white nurses at Lutz, led by Christina Tokarski and assisted by Lewis, made false accusations and targeted Joseph because of her race and color.**

13

The nursing staff at Lutz is predominantly white. Ex. 8 at 22:5-11. As nurse manager, approximately 50 nurses reported to Tokarski, of whom "probably four or five" were African-American; none were of South Asian or Indian national origin. Ex. 30, Dep. of Christina Tokarski at 12:4-13:19. Tokarski is white. Ex. 30 at 12:4-13:19. Joseph met Albito in 2012 when Albito was also an urgent care physician; they "sat right next to each other." Ex. 2 at 160:7-167:17. On more than one occasion when they were colleagues, Albito warned Joseph that her skin color made her a target (scratching his left hand with the index finger of his right hand and saying, "**Angela, it's about this**." Ex. 2 at 160:7-167:17 (emphasis added). Joseph understood that Albito, by his hand motions, was telling her "it was a matter of color or ethnic origin." Ex. 2 at 129:4-130:9. One occasion was on or around October 20, 2016; Albito performed "the hand scratching motion" and said, "She [referring to another doctor] is white, and the nurses are all white, they will listen to her, and you are not." Ex. 2 at 160:7-167:17; Ex. 31. In his EEO affidavit, Albito answered "yes" when asked if Joseph had ever indicated to him or anyone in management that she was being harassed or subjected to a hostile work environment; and he then said Joseph told him, "It's because of the color of my skin or something like that." Ex. 32 p. 290; Ex. 6 at 121:5-122:22. Albito said this occurred when he first asked Joseph for an explanation regarding the three cases. Ex. 6 at 121:5-122:22.

Tokarski believes Joseph's race is Indian and that Joseph is of "Indian descent, origin;" She has observed that Joseph is "dark-skinned." Ex. 30 at 14:5-16. Tokarski "had [ ] very hostile and negative behavior towards [Joseph]." Ex. 2 at 97:19-98:13. Tokarski was hostile toward Joseph for more than personal reasons; Tokarski "behaved negatively towards people of color." Ex. 2 at 110:11-25. Tokarski was instrumental in engineering the exit of a black nurse manager named Archia Jackson. Ex. 2 at 115:6-117:16. Bates's description of Joseph as "nasty and

14

belligerent" had a racial component; "nasty" is a stereotypical description of women of color. Ex. 2 at 148:20-149:12. Archambault was biased against Joseph due to Joseph's ethnicity or national origin; she was hostile, distant, and aloof toward Joseph. Ex. 2 at 358:7-21. Asked about Joseph's race, Archambault said, "I didn't ever really think about what race she is or where she's from, you know.  I never thought about it." Ex. 9 at 10:6-23. She added, "I know she's not white, Caucasian." Ex. 9 at 10:6-23. Asked what she considered to be Joseph's race, Lauria said, "I don't know. I guess I never thought of it. Indian?" Ex. 33at 10:2-12. She described Joseph's skin color as "tan." Ex. 33at 10:2-12. Some of the nursing staff believed Joseph was black. Ex. 2 at 111:8-112:5. Joseph's boyfriend, who is African American, visited Joseph at Lutz. Ex. 2 at 111:8-112:5. Tokarski was present; after her boyfriend left, Joseph heard some of the urgent care nurses saying, "Oh, we didn't know she [Joseph] was black." Ex. 2 at 111:8-112:5.

Three African American Lutz employees filed EEO complaints against Tokarski alleging racial discrimination and a hostile work environment (Mikayla West, Crystal Alexander, and Mikailu Sorie). Ex. 30 at 17:17-18:6, 19:19-20:2, 20:3-19, 21:9-23:16, 25:15-17. Lewis has been the subject of two EEO complaints, one by an African American (Mary Jackson) alleging race discrimination. Ex. 7 at 28:22-31:23. Bates was named as the responding management official in one EEO complaint, filed by Lutz's former Chief of Pharmacy, whose skin color Bates described as "brown;" the complaint alleged age discrimination. Ex. 11 at 36:5-37:12.

Lewis and Tokarski worked "as a coordinated team." Ex. 2 at 85:22-86:22. Tokarski, in February or March 2018, rented a house from Lewis and her husband about a mile from Lewis's house. Ex. 30 at 30:21-31:19. When Lewis told Joseph that Lewis was renting a house on her farm to Tokarski, Joseph knew that she [Joseph] "was going to be in trouble" because Tokarski "had been very hostile towards [Joseph]" and "other people of color in the hospital, including

15

Sorie, and Joseph "had been forewarned that [she] needed to watch [her] back by other nurses," including Janet Schuster. Ex. 2 at 43:12-47:16. After Tokarski moved into a house on Lewis's property, Lewis started saying to Joseph, "I couldn't catch your call because I was . . . just over at [Tokarski's], we were having a few drinks." Ex. 2 at 43:12-47:16.

Lewis would say things like, "I'm just a good old redneck," which Joseph interpreted as Lewis "letting [Joseph] know what [Lewis's] understanding of race relations [was]." Ex. 2 at 41:19-43:11. Lewis also said, "I can't be prejudice[d].  I had a black roommate." Ex. 2 at 41:19-43:11. Lewis was a "very good friend" of Lutz nurse Paulette Shrumkowski (phonetic), who made inappropriate comments, including, "My granddaddy always said there is a [N-word] in those back woods" and Joseph knew Lewis and Shrumkowski "had a shared experience like that." Joseph and Lewis once discussed a patient who was "not answering a question that [Joseph] was asking," and Lewis said, "Oh, you know, that's not uncommon. Black people usually don't answer questions directly." Ex. 2 at 32:23-33:20.

The relationship between doctors and nurses should be respectful and collaborative but "[u]ltimately the physician in charge of the patient care is responsible for the decision-making and owns the decision and the outcome." Ex. 11 at 101:18-102:7; Ex. 7 at 92:20-93:4. Between April and May 2018, Lewis began to monitor Joseph's cases closely. Ex. 2 at 73:9-75:5. In a September 5, 2018, email to Tokarski, Albito asked her to send him the "list of cases you sent me the past year on concerns re: Dr. J [Joseph] not including the ones currently reviewed or Peer Reviewed." Ex. 36. There is a peer review process at all VA facilities. Ex. 2 at 73:9-75:5. At the two other VA facilities at which Joseph had worked, she had never been subject to a peer review. Ex. 2 at 73:9-75:5. At Lutz, between November 2015 and April 2, 2018, she was the subject of "two or three." Ex. 2 at 73:9-75:5. After April 2, 2018, she was the subject of "four or five." Ex.

2 at 73:9-75:5. Bates told Joseph, "I know there is a nursing problem, but if you say something to one of them, they all just band together." Ex. 2 at 124:2-9.

In a summary of fact-finding interviews regarding the treatment of Patient 3, one or more nurses, including Misty Lauria (Jacobs) falsely claimed that Joseph could not read a monitor or EKG. Ex. 36; Ex. 11 at 95:21-96:11, 97:5-20. In the same summary, Lauria (Jacobs) said she "almost left" the scene when Joseph arrived to care for Patient 3 because she questioned Joseph's competence. Ex. 33, Dep. of Misty Lauria at 18:3-21:12; Ex. 36. When interviewed about Patient 3, Archambault said that, on one occasion (in a case not reviewed by the Board), Joseph wanted to "fully bag" a patient. Ex. 36; Ex. 9 at 23:25-25:12. Archambault disagreed, so she only pretended to do it. Ex. 9 at 23:25-25:12. Bates said this was "a horrible thing to say." Ex. 11 at 103:22-105:17. Joseph had to make a complaint about "a patient incident" and was talking, in Tokarski's presence, to the nurse who was involved; as Joseph walked out of the room, she heard Tokarski say "that bitch needs to be fired," referring to Joseph. Ex. 2 at 107:2-108:15. Tokarski caused Joseph to be investigated for a HIPAA complaint. Ex. 2 at 159:2-5. Tokarski initiated a March 30, 2018 peer review of Joseph; Lewis told Joseph that Tokarski had initiated the review. Ex. 2 at 218:7-12. Lauria (Jacobs) complained in writing about Joseph's patient care "five to eight" times. Ex. 33at 10:13-17.

**I.   Joseph engaged in Title VII protected activity when she spoke out on behalf of Mikailu Sorie.**

Mikailu Sorie, who is black and was born in Sierra Leone, "was under investigation" in September 2017 and detailed to urgent care, as a staff registered nurse, during the investigation. February 2018. Ex. 8 at 8:4-10:2. Sorie reported to Tokarski while he was detailed to urgent care. Ex. 8 at 27:4-23. Sorie believed that Tokarski was discriminating against him during his detail because "[s]he was extremely hostile and she treated [him] differently." Ex. 8 at 37:13-38:4. On

17

December 10, 2017, Joseph emailed Bates about Sorie (copying Sorie on the email), saying she "was very disturbed to learn that he is being investigated from what I have heard from several people on, 'trumped up charges, that he did not do, but because he pissed off people at the top, and now he has been sent down to Urgent Care so Chris Tokarski can break him.' I was shocked, I asked why no one has spoken up, and they say, it is 'because they are picking on him now, and they will do it to me next.' . . . In other words they are afraid of retaliation." Ex. 36. She referred to Sorie "growing up very poor in a village in Sierra Leone," and praised him as a "very honest, decent person" and "very solution oriented." Ex. 36. She said his treatment was "[v]ery sad for our working environment." Ex. 36. Joseph told Lewis and Albito about her email. Ex. 2 at 58:19-59:17. In her email, Joseph was trying to tell Bates that "this was another example of mistreatment and hostility towards people of color. . . . without saying that he's black." Ex. 2 at 211:25-212:11. She referred to Sorie's national origin "to let Dr. Bates know that that there was discriminatory behavior," even though she is "not saying it directly." Ex. 2 at 211:25-212:11. Sorie believed that Joseph's email to Bates was "in opposition to what [Joseph] believed was retaliatory discrimination" against Sorie. Ex. 8 at 41:16-44:6.

Tokarski, because of Joseph's statements and her discussion with the nursing staff, knew that Joseph supported Sorie though Tokarski did not know that Joseph had written the email to Bates. Ex. 2 at 126:3-127:11. Joseph said, "The upper management, all of them knew. They just talked, they gossiped. That's the culture." Ex. 2 at 125:20-126:2. Lewis knew that Joseph had been supportive of Sorie and thought the investigation was unfair. Ex. 7 at 25:7-24. Lewis told Albito that Joseph was concerned about Sorie's treatment. Ex. 7 at 26:4-24.

**J.  Joseph engaged in Title VII protected activity when she participated in an investigation and spoke on behalf of Gabriel Mirelez.**

In late 2017, Joseph responded to a pager alert and Gabriel Mirelez, a Hispanic nurse's aid, was there when Joseph arrived. Ex. 2 at 64:16-67:4. Mirelez said, "I think [the patient] fell out of bed, but I'm not sure exactly what happened." Ex. 2 at 64:16-67:4. Joseph examined the patient and it "appeared to [her] more as if [the patient] had crawled out of bed and sat down." Ex. 2 at 64:16-67:4. Joseph was contacted by HR and asked "questions pertaining to a grievance" and realized it related to Mirelez. Ex. 2 at 67:7-70:2. Joseph described what happened to the HR representatives. Ex. 2 at 67:7-70:2. She then learned that Mirelez, who had been suspended, was back on duty. Ex. 2 at 67:7-70:2. Mirelez told Joseph, "Thank you so much." Ex. 2 at 67:7-70:2. Lewis was aware that Joseph supported Mirelez because she overheard Lutz employee Jane Vater tell Lewis, "I don't know what [HR] is doing over here talking to Dr. Joseph. She doesn't know what went on." Ex. 2 at 70:3-23. Management at Lutz "cared that [Joseph] always stood up for minorities" and she "was known to speak on behalf of" people other than Mirelez and Sorie. Ex. 2 at 71:13-24.

### K.  Joseph was replaced by a white physician, Dr. Galina Gladka, though the VA claims Gladka only filled an "equivalent" position.

Dr. Galina Gladka is a white female of Ukrainian descent who came to Lutz as a Canadian citizen working as a fee-based provider. Ex. 2 at 138:3-142:9. The VA "wanted [Joseph] out and Dr. Gladka in." Ex. 2 at 59:18-23. In April 2018, Gladka "began indicating that she wanted a full-time position." Ex. 2 at 138:3-142:9. Albito told Joseph that "there were other doctors that wanted [Joseph's] position." Ex. 2 at 138:3-142:9. Lewis did not recall who the VA hired to replace Joseph but said "it might have been Dr. Gladka." Ex. 7 at 68:22-69:22. Lewis said that, at some point in 2018, Gladka transitioned to a full-time hospitalist after she became a U.S. citizen. Ex. 7 at 68:22-69:22. In his EEO affidavit, when asked whether he had hired anyone to replace Joseph, Albito said he had made an offer to Dr. Tom Abalo, who is of Chinese

national origin. Ex. 6 at 145:17-147:4. But Albito said Abalo was not hired to replace Joseph. Ex. 6 at 145:17-147:4. He said, "we don't have a spot specifically for an opening from Dr. Joseph's position." Ex. 6 at 145:17-147:4. Albito said Gladka, like Abalo, filled a position equivalent to Joseph's but did not fill Joseph's position. Ex. 6 at 147:9-148:1.

**L.  Joseph made reasonable efforts to mitigate her economic damages, but the suspension of her clinical privileges by Lutz severely limited her options.**

After her removal, Joseph applied to return to the Detroit VA to work in the emergency room in a fee-for-service position; she did not get the position. Ex. 2 at 402:5-404:8. Joseph spoke to a recruiter who told her that it would be "very difficult" for a physician who had been suspended to get credentialed. Ex. 2 at 404:11-407:17. Joseph applied for several positions but did not proceed after she received the credentialing packet that required her to disclosed whether she had ever been suspended. Ex. 2 at 404:11-407:17. She "did not want [it] to get out in the market that [she] had been suspended wrongfully for things that [she] did not do." Ex. 2 at 404:11-407:17. Because she was trained in acupuncture, Joseph leased office space and started her own acupuncture practice. Ex. 2 at 409:20-410:12. As of March 3, 2020, Joseph's practice had about five patients. Ex. 2 at 409:20-410:12.

## STANDARD OF REVIEW

Summary judgment is proper only where "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A party opposing a motion for summary judgment "'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citing Fed. R. Civ. P. 56(e)). Additionally, in reviewing a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether

20

there is a genuine issue for trial." *Id.* at 249. Plaintiff's evidence must be accepted as true and all reasonable inferences drawn in her favor. *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).

## ARGUMENT

### A. Joseph, with the disputed facts viewed in the light most favorable to her, has demonstrated *prima facie* cases of race and national origin discrimination.

Title VII makes it unlawful for an employer to discharge any individual because of such individual's race, color, or national origin. *See, e.g., Bostock v. Clayton Cty., Ga.,* 140 S. Ct. 1731, 1738 (2020) (citing 42 U.S.C. § 2000e–2(a)(1)). Claims under Title VII use but-for causation, meaning an employer cannot avoid liability merely "by citing some *other* factor that contributed to its challenged employment decision." *Id.* at 1739. An employer is liable when the plaintiff establishes that the employer had a discriminatory intent or motive for taking a job-related action. *See Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 346 (6th Cir. 2012) (internal citations omitted)). Discriminatory intent may be demonstrated through either direct or circumstantial evidence. *Id.*

To sufficiently demonstrate a *prima facie* case of race or national origin discrimination, a plaintiff must establish 1) that she was a member of a protected class; 2) that she suffered an adverse employment decision; 3) that she was qualified for the position held; and 4) that she was replaced by, or treated differently than, someone outside of the protected class. *See Coffman v. United States Steel Corp.*, 185 F. Supp. 3d 977, 984 (E.D. Mich. 2016) (internal citations omitted); *Idemudia v. J.P. Morgan Chase*, 434 F. App'x 495, 501 (6th Cir. 2011) (internal citations omitted). The three-step framework developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), guides the analysis of discrimination claims based upon circumstantial

21

evidence. *See Chattman*, 686 F.3d at 347. Deviation from established policy or practice may be evidence of pretext. *Allen v. Braithwaite*, 2020 WL 3977671, at *7 (W.D. Tenn. 2020).

Joseph, as a person of color and a person of Indian national origin, is a member of protected class. She suffered an adverse employment decision when she was separated by the VA. Prior to her separation, per her supervisor Albito, she was qualified for her position and fulfilling the requirements of a hospitalist. Ex. 6 at 40:1–15. Taking the disputed facts in the light most favorable to her, she was replaced by Dr. Gladka, who is white and outside of Joseph's protected class. Ex. 2 at 59:18-23, 138:3-142:9; Ex. 7 at 68:22-69:22; Ex. 2 at 145:17-148:1.

Joseph presented strong evidence of pretext in the VA's deviation from its established policy regarding the composition of an SRB—most notably, the VA chose no hospitalist or other member with expertise similar to Joseph's, and improperly included a Nurse Practitioner as a member. It deviated from its established practice in making the unexplained "error" regarding the date of her appointment as a full-time, permanent staff physician. And it deviated from its established policy or practice in its "curbside consult" with Schildhouse, rather than using its form Peer Review process. Finally, the appeal panel's determination that Joseph's care of Patients 1, 2, and 3 met the Standard of Care is strong evidence of pretext in the SRB's examination of those cases.

Joseph also presented strong evidence of the VA's "cat's paw" liability. Cat's paw liability occurs where "a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and that if that act is a proximate cause of the ultimate employment action, then the employer is liable under the [Act]." *See Chattman*, 686 F.3d at 351 (6th Cir. 2012) (citing *Staub v. Proctor Hospital*, 562 U.S. 411, 422 (2011) (emphasis in original)). The Sixth Circuit Court has recognized that

discrimination can be demonstrated where a plaintiff offers evidence of a "causal nexus" between the ultimate decisionmaker's decision to discipline the plaintiff and the supervisor's discriminatory animus. *See id.* at 350 (internal citations omitted). Additionally, a plaintiff needs to demonstrate that "'[b]y relying on this discriminatory information flow, the ultimate decisionmakers acted as the conduit of [the supervisor's] prejudice—his cat's paw." *See id.* (internal quotation marks omitted).  The VA's cat's paw liability is highlighted by the SRB's reliance on information from Lewis (and the white nurses who targeted Joseph) regarding the three cases. As explained in Joseph's Statement above, Lewis (and the white nurses who targeted Joseph) misrepresented Joseph's actions; this is exemplified by Lewis's false statements regarding her discussion with Trimble about Patient 3, statements which Trimble said were false.

Joseph also, as explained in her Statement above, presented strong evidence of a racist culture at Lutz, particularly on the part of Tokarski, other white nurses, and Lewis, and including Albito's own warnings to Joseph that her skin color would cause her to be mistreated.

### B. Joseph, with the disputed facts viewed in the light most favorable to her, has demonstrated a *prima facie* case of retaliation.

To establish a *prima facie* claim of retaliation, a plaintiff must show: (1) that she engaged in a protected activity, (2) her protected activity was known by Defendant, (3) thereafter, Defendant took an action that was materially adverse to her, and (4) a causal connection existed between the protected activity and the materially adverse action. *See Wingo v. Michigan Bell Tel. Co.*, 815 F. App'x 43, 46 (6th Cir. 2020) (internal citations omitted). Additionally, a plaintiff must show that her protected conduct was a but-for cause of the adverse employment action. *See Coffman*, 185 F. Supp. 3d at 986 (internal citations omitted). Protected conduct includes complaining to anyone (including management or other employees) about allegedly unlawful practices. *See id.* (internal citations omitted). Retaliation against an employee who (1) opposed

any practice made unlawful by Title VII or (2) testified, assisted, or participated in any manner in

an investigation, proceeding, or hearing is prohibited. *Leilei Lin v. Henry Ford Health Sys.*, No.

18-13870, 2020 WL 2112351, at *10 (E.D. Mich. May 4, 2020) (citing 42 U.S.C. § 2000e–3(a)).

The Sixth Circuit has interpreted this "opposition clause" to protect not only formal complaints

to the EEOC or a similar state agency, but also complaints to management or human resources

and "less formal protests of discriminatory employment practices." *Id.* (internal citation omitted).

Subsequently, showing close temporal proximity between an employer's knowledge of

protected activity and the adverse employment action can support causation. *Id.* (internal

citations omitted). The employer bears the burden of offering legitimate, nonretaliatory reasons

for its actions taken. *See Wingo v. Michigan Bell Tel. Co.*, 815 F. App'x 43, 46 (6th Cir. 2020)

(internal citation omitted). Where an employer offers legitimate, nonretaliatory reasons for its

actions, the burden shifts back to the plaintiff to show that the proffered reasons were pretext for

retaliation. *See id.* (internal citation omitted).

Joseph engaged in protected activity when she opposed what she considered to be unfair

treatment of Sorie and Mirelez because of their race, color, and national origin. Her email to

Bates, and related follow-up discussions, constituted a "less formal protest" of discriminatory

practices protected under Title VII. As explained in the Statement above, Joseph emailed Bates

"to let Dr. Bates know that that there was discriminatory behavior," even though she was "not

saying it directly." Ex. 2 at 211:25-212:11. The evidence, taken in the light most favorable to

Joseph, shows that Lewis and Tokarski were aware of Joseph's protected activity, and retaliatory

complaints by nurses, led by Tokarski, escalated following Joseph's protected activity. The

evidence also demonstrates that Joseph's participation in the investigation of Mirelez's grievance

was protected activity.

24

**C.  The VA is not entitled to summary judgment regarding Joseph's economic damages.**

As explained in her Statement above, Joseph was unable to find employment as a physician after her separation because the VA's had suspended her credentials. She should not be further disadvantaged by the VA's discrimination and retaliation because its actions made her unemployable in her profession.

## CONCLUSION

Joseph was, and is, a dedicated physician who had never been disciplined prior to her separation—and has never been the subject of a patient complaint. Her last pre-separation evaluation documented that she had a positive attitude and her clinical and technical skills were deemed good. The white nurses at Lutz, led by Tokarski and abetted by Lewis, targeted Joseph because she was nonwhite and of Indian national origin, with a series of complaints based on false allegations regarding Joseph's care of her patients. And Joseph's vocal support of two nonwhite nurses also targeted by these white nurses added retaliatory animus to the ongoing discriminatory animus of the white nurses.

Joseph's supervisors deviated from the VA's policies to subject the three cases, and Joseph, to a Summary Review Board that was improperly comprised of members without similar expertise to Joseph's and improperly included a Nurse Practitioner. Relying on the false allegations of the white nurses and Lewis, and disregarding Joseph's reasonable explanations, the VA ended Joseph's employment. But the VA's final determination was that all three cases met "the Standard of Care."

The VA's motion for summary judgment should be denied.

Dated:  November 2, 2020              Respectfully submitted,

                                 /s/ John T. Harrington
John T. Harrington
Kellee B. Kruse
R. Scott Oswald
The Employment Law Group, P.C.
888 17th Street, N.W., Suite 900
Washington, D.C. 20006
(202) 261-2830 (telephone)
(202) 261-2835 (facsimile)
tharrington@employmentlawgroup.com
kkruse@employmentlawgroup.com
soswald@employmentlawgroup.com

David L. Haron
Hoyer Law Group, PLLC
30300 Northwestern Hwy., Ste 115
Farmington Hills, MI 48334
248-762-7009 (telephone)
800-651-2502 (facsimile)

*Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 2, 2020, a true and correct copy of the

foregoing was served via ECF:

James J. Carty
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226
Office: (313) 226-9705
Facsimile: (313) 226-3271
Email: james.carty@usdoj.gov


Bradley H. Darling
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-9137
Email: bradley.darling@usdoj.gov

*Attorneys for Defendant*



*/s/ John T. Harrington*
 John T. Harrington

27