1. Joseph worked at Lutz from June 2012 to February 2013 in "a staff position." (NOT DISPUTED)

2. She left Lutz in February 2013 to work at a private hospital; she left that facility in December 2013 to work at the Detroit VA as a full-time fee-based physician. (NOT DISPUTED)

3. She returned to Lutz in November 2015, working in urgent care as a fee-based physician. (NOT DISPUTED)

4. Joseph was appointed as full-time staff at Lutz on June 29, 2016 and her full-time service should be counted from that date. (DISPUTED – Argument contradicted by objective evidence, *see* Defendant's Reply Brief, Section B)

5. A June 28, 2016 VA "Board Action," signed by Albito and Bates (on June 29, 2016), "recommend[ed] [Joseph] be appointed, credentialed and privileged as a full-time, permanent staff physician." (NOT DISPUTED)

6. Because Joseph was given full-time status as of June 29, 2016, she was not a probationary employee after June 29, 2018. (DISPUTED – Argument contradicted by objective evidence, *see* Defendant's Reply Brief, Section B)

7. In an October 13, 2016 memo, the VA claimed that the "Board Action for permanent appointment, dated 06/28/2016 was deemed inappropriately" and "should have indicated that she was to be appointed temporary." (NOT DISPUTED)

8. The VA's 30(b)(6) designee, Steven Savino, was unaware of any other instance in which such an "error" had occurred. (NOT DISPUTED)

9. Prior to her separation, Albito never disciplined, warned, or counseled Joseph; and she was qualified for her position and fulfilling the requirements of a hospitalist. (DISPUTED – Joseph was counseled previously for being late to work repeatedly, *see* ECF No. 27-23, PageID.511, at 74:21-75:3; otherwise NOT DISPUTED)

10. Joseph was never the subject of a complaint by a patient. (NOT DISPUTED)

11. Albito, Lewis, Sorie, and Archambault testified that they never observed Joseph using inappropriate or unprofessional language. (NOT DISPUTED)

12. Joseph was hard-working and dedicated. Ex. 7 at 104:2-3. (NOT DISPUTED that this was a statement of opinion made by Sally Lewis)

13. Joseph's performance evaluation for the period ending September 30, 2017, was completed by Albito and signed by Bates as the approving official. (NOT DISPUTED)

14. As of September 2017, as documented in her evaluation, Joseph had demonstrated a positive attitude for patients, hospital staff, and other members of the medical staff; and her clinical and technical skills had been observed by her peers and were deemed to be good. (NOT DISPUTED)

15. Patient 1, a 67-year-old male, was brought to the Lutz urgent care clinic by a neighbor on April 30, 2018, for confusion, frequent falls, and because he was unable to care for himself. (DISPUTED – Contradicted by full patient medical record, which show patient admitted March 20, 2018, and discharged April 2, 2018)

16. That day, a hospitalist, Dr. Patterson, suggested Patient 1 be discharged; no CT head scan was done, despite a history of frequent falls. (DISPUTED – contradicted by full patient medical record; NOT DISPUTED that Patient 1 did not have a head CT during this admission)

17. On May 1, 2018, a nurse from Lutz visited Patient 1 at his home. (NOT DISPUTED)

18. Patient 1 should have been admitted at that time; "he needed to be worked up." (DISPUTED – argument that is contradicted by full patient medical record, DEF-4913 to DEF-4915)

19. On May 2, 2018, Patient 1 returned to Lutz's urgent care but only saw a social worker. (DISPUTED – contradicted by full patient medical record which does not show a visit on this date)

20. On May 4, 2018, Patient 1 again returned to Lutz and was admitted by the urgent care physician, Dr. Brooks, for dementia and an elevated ammonia level. (NOT DISPUTED)

21. Patient 1 should have been placed on a CPAP at this point; and a variety of drugs could have been administered to decrease the ammonia level—but none were given. (NOT DISPUTED that this is Joseph's opinion)

22. On May 5, 2018, Joseph reviewed Patient 1's records and noted he was less alert and oriented, the ammonia level remained high, and nothing was being done to address it. (==DISPUTED== – Joseph was not working on May 5, 2018, and did not assume care of the patient until May 7, 2018, her review of the medical record is opinion, NOT DISPUTED that this is Joseph's opinion after she reviewed the medical records)

23. Joseph's notes said that no arterial blood gas (ABG) testing had been done, and that most physicians would have ordered ABG testing at this point. (==DISPUTED== – Joseph was not working on May 5, 2018, and did not assume care of the patient until May 7, 2018; NOT DISPUTED that this is Joseph's opinion after she reviewed the medical records)

24. On May 6, 2018, Joseph noted that Patient 1 still had not been treated for elevated ammonia levels; no CPAP had been tried; no ABGs had been taken; and there still had not been a CT. (==DISPUTED== – Joseph was not working on May 6, 2018, and did not assume care of the patient until May 7, 2018; NOT DISPUTED that this is Joseph's opinion after she reviewed the medical records)

25. Joseph, in her notes, wrote, "Basically, the patient just sat in the room all weekend with the anticipation that he would be sent to a nursing home on Monday." (==DISPUTED== – Joseph was not working on May 6, 2018, and did not assume care of the patient until May 7, 2018; NOT DISPUTED that this is Joseph's opinion after she reviewed the medical records)

26. On May 7, 2018, Joseph began her shift at 7:00 a.m. and first saw Patient 1 at 7:45 a.m.; he was asleep and Joseph did not examine him at that time. (NOT DISPUTED)

27. She then went to "the morning huddle," during which she was told that the nurses were preparing to transfer Patient 1 to a nursing care or an assisted care living facility. (NOT DISPUTED)

28. Joseph saw Patient 1 after the morning huddle at 2:30 p.m.; she spoke with him and conducted a full exam "from head to toe." (NOT DISPUTED)

29. Joseph also ordered Lactulose, a drug to reduce and normalize ammonia levels. (NOT DISPUTED)

30. After the morning huddle and until 2:30 p.m., Joseph was seeing other patients. (NOT DISPUTED)

31. Patient 1 had been Joseph's responsibility for only about eight hours (from 7:00 a.m. to about 2:30 or 3:00 p.m.). (NOT DISPUTED)

32. At 4:15 p.m., Joseph notified "Respiratory" of the need for immediate ABGs. (NOT DISPUTED)

33. Joseph also ordered BiPAP but wanted the ABGs before she placed Patient 1 on BiPAP. (DISPUTED – Joseph ordered a non-rebreather oxygen mask and only changed that order to an order for BiPap after intervention by respiratory therapist Noelita Cicinelli, *see* ECF No. 27, PageID.126-127.)

34. The ABGs were back at 5:30 p.m. and showed that Patient 1 had high carbon dioxide levels; he was in "permissive hypercapnia" and his carbon dioxide and bicarb levels "were very high," which indicates a chronic condition and that Patient 1 "was decompensating fast." (NOT DISPUTED that the ABGs showed high carbon dioxide levels; NOT DISPUTED that the other statements are Joseph's opinion)

35. In the meantime, Joseph "was trying to make an arrangement to ship him out." (NOT DISPUTED)

36. After the ABGs were back, Patient 1 was taken for a head CT, which Joseph had already ordered. (NOT DISPUTED)

37. Joseph's notes say the following: "I came to the office and ordered ABGs, BiPAP, CT head and EKG, and I placed a call to the AOD to connect me with Covenant Hospital and supervising nurse to plan for transfer of this patient out of facility." (NOT DISPUTED that Joseph's undated personal notes, drafted after her suspension, contain this statement)

38. While Joseph planned to transfer Patient 1 before she had test results, she wanted to perform them to better inform the receiving facility. (NOT DISPUTED)

39. Joseph notes indicate that, at 5:44 p.m. on May 7, 2018, there was a "failed trial of BiPAP - the patient refused the mask; he was anxious. (NOT DISPUTED)

40. "Will transfer patient to Saginaw for hypercapnia with hypoxia requiring intubation." (NOT DISPUTED)

41. Joseph discussed the case with Lewis and Lewis agreed with Joseph, saying "Go ahead." (NOT DISPUTED)

42. The VA's final determination regarding this case was that there were no findings to support substandard care, professional incompetence or professional misconduct and "the Standard of Care was met." (DISPUTED – this is a mischaracterization of VA processes)

43. Patient 2 came to Lutz's urgent care with low hemoglobin. (DISPUTED – Patient 2 came to the VA on May 7, 2018, for a blood transfusion)

44. Patient 2 had a form of leukemia and also needed frequent blood transfusions because of gastrointestinal (GI) bleeding. (NOT DISPUTED)

45. Patient 2, prior to May 7, 2018, had a series of blood transfusions at Lutz in March, April, and May, 2018. (NOT DISPUTED)

46. The urgent care physician, who is white, called Joseph and said that Patient 2 needed to be admitted for a blood transfusion. Ex. 2 at 33:21-36:24; Ex. 13; Ex. 15. (DISPUTED – *See* Plaintiff's Correction, ECF No. 32.)

47. Joseph had already reviewed Patient 2's chart and spoken with him and knew he did not want to be admitted, and suggested he be brought to the infusion clinic and given blood products. (DISPUTED – *See* Plaintiff's Correction, ECF No. 32.)

48. The urgent care physician disagreed. (DISPUTED – *See* Plaintiff's Correction, ECF No. 32.)

49. Albito told Joseph to admit the patient, which Joseph did, and gave him two units of blood. (DISPUTED – *See* Plaintiff's Correction, ECF No. 32.)

50. Joseph then talked to Lewis about Patient 2; Lewis said, "Dr. Albito is trying to protect you. The physician that you're dealing with was a former chief over here, and the nurses will all follow her, and she is white and you are not." (DISPUTED – *See* Plaintiff's Correction, ECF No. 32; further DISPUTED in that Lewis denies making this statement at any time)

51. On May 7, 2018, Joseph was managing Patient 1 and Patient 2 at the same time. (NOT DISPUTED)

52. Joseph first interacted with Patient 2 at about 1:00 p.m. on May 7, 2018; she "visualized him, but [she] did not examine him." (NOT DISPUTED)

53. Joseph discussed admitting Patient 2 with the infusion care nurse, Andrea Jimenez, and they decided Patient 2 would get his blood products and Joseph would then evaluate him and "decide what to do with him." (DISPUTED – Not supported by the medical record)

54. Per VA policy, the infusion clinic was "nurse managed." (NOT DISPUTED that nurses play a role in managing patient care in all areas of the Saginaw VA facility; otherwise DISPUTED)

55. Between 4:00 and 6:00 p.m. on May 7, 2018, Joseph was very occupied with Patient 1, who was in respiratory crisis; Patient 1 was her priority. (NOT DISPUTED)

56. Joseph and Dr. Malloy, Patient 2's primary care doctor, ordered a GI consult for Patient 2's May 11, 2018 appointment. (NOT DISPUTED)

57. Joseph told Patient 2 that she was trying to get him into the GI clinic at the Ann Arbor VA; she needed a GI consult first. (DISPUTED – Joseph's own testimony is that she did not personally interact with the patient in the transfusion clinic on May 7, 2018, *see* ECF No. 27-3, PageID.327, at 301:3-11.)

58. When Joseph finished treating Patient 1, she "came running up to see Andrea [Jimenez]" regarding Patient 2. (NOT DISPUTED)

59. Jimenez told her that Patient 2 had gone home. (NOT DISPUTED)

60. "[T]hat really worried [Joseph], so then [she] called the patient at home." (NOT DISPUTED)

61. The general protocol was that the nurse could discharge the patient or call someone else if the hospitalist was busy. (NOT DISPUTED)

62. But "the nurse should have waited" until Joseph examined Patient 2. (NOT DISPUTED that this is Joseph's opinion)

63. Joseph had told Jimenez, "Make sure I see the patient before he leaves." (DISPUTED – this fact is disputed by Jimenez and not memorialized in the contemporaneous medical record)

64. When Joseph called Patient 2's home, his wife said he "feeling good." (NOT DISPUTED)

65. Joseph told Patient 2 to either return to Lutz or go to the nearest hospital. (NOT DISPUTED)

66. Patient 2 said, "I feel fine . . . and I'll see you tomorrow." (NOT DISPUTED)

67. Joseph again advised him to return to Lutz or go somewhere else immediately. (NOT DISPUTED)

68. Patient 2 returned to Lutz on May 8, 2018, for another transfusion. (NOT DISPUTED)

69. Joseph told Jimenez again to "hold" Patient 2. (DISPUTED – this fact is disputed by Jimenez and not memorialized in the contemporaneous medical record)

70. Joseph said, emphatically, "This time definitely do not let him go." (DISPUTED – this fact is disputed by Jimenez and not memorialized in the contemporaneous medical record)

71. On May 8, 2018, Joseph did not interact with Patient 2 or his family because she was involved with another patient. (NOT DISPUTED)

72. The nurse did not mention "rusty stool" to Joseph on May 8, 2018; if she had, Joseph "would have gone and seen the patient." (DISPUTED – this fact is disputed by Jimenez and directly contradicted in the contemporaneous medical record, *see* ECF No. 27, PageID.130.)

73. If Joseph had seen Patient 2 on May 8, 2018, she "would have arranged for transport" by ambulance to a facility in Ann Arbor. (NOT DISPUTED)

74. But Jimenez told Patient 2 that his family should take him to the Ann Arbor VA ER; Joseph learned that only after she finished with her other patient and spoke to Jimenez. (NOT DISPUTED)

75. Joseph called the Ann Arbor ER between 7:00 p.m. and 9:00 p.m. and confirmed that Patient 2 had arrived. (NOT DISPUTED)

76. Patient 2 was admitted at the Ann Arbor VA and died a month later.(NOT DISPUTED)

77. The following was not disputed by the SRB: Joseph did not see Patient 2 until May 7 and Patient 2 had previously been receiving treatment for months; many providers saw Patient 2 and had no answers; Patient 2 had been in for multiple blood transfusions and needed a higher level of care due to multiple chronic issues." (==DISPUTED== – this is a mischaracterization of VA processes, the Summary Review Board was not charged with confirming or disputing these specific facts)

78. MacMaster is not aware of any documentation that Joseph ever instructed the clinic to release Patient 2 or decided that he should travel to Ann Arbor in a personal vehicle. (NOT DISPUTED)

79. Albito is not aware of anything that shows the nurse consulted Joseph about an earlier transfer. (NOT DISPUTED)

80. Albito agreed that the nurse "definitely" should have consulted with Joseph before instructing Patient 2's family to take him to another facility; and if Joseph was not notified by the nurse, "that would be a concern." (NOT DISPUTED)

81. The VA's final determination regarding this case was that there were no findings to support substandard care, professional incompetence or professional misconduct and "the Standard of Care was met," though there was a "Systems Issue." (==DISPUTED== – this is a mischaracterization of VA processes)

82. Patient 3 was a VA dental clinic employee at Lutz who had chest pain while at work. (NOT DISPUTED)

83. Joseph and ACT nurse Cheryl Hirn were the first "Rapid Responders" to arrive at the dental clinic. (NOT DISPUTED)

84. A standby monitor, which has a blood pressure cuff and pulse oxygen but not a cardiac monitor, was attached to Patient 3. (NOT DISPUTED)

85. Patient 3's oxygen levels were good and she was alert. (NOT DISPUTED)

86. Joseph agreed that a Code Blue should be called, and 911 should be called. (==DISPUTED==, the record shows that Joseph has changed her position on whether a Code Blue should have been called multiple times, NOT DISPUTED that Joseph agreed with calling 911)

87. Archambault and Hirn said an AED should be attached to Patient 3. (NOT DISPUTED that Archambault and Hirn were among the employees who said Joseph should have obtained a cardiac rhythm by using an available cardiac monitor on the patient)

88. Joseph, who has managed over 2,000 Code Blue or Rapid Response situations, said "what they gave me were not EKG leads, but defibrillation pads;" they wanted Joseph to use the AED "incorrectly." (DISPUTED, Joseph's version of events is disputed by other employees and has changed multiple times; NOT DISPUTED that Joseph has managed many patient care situations)

89. To use the AED as a monitor, certain preparatory steps needed to be taken but had not been done. (DISPUTED, Joseph's version of events is disputed by other employees and has changed multiple times)

90. When Archambault handed the defibrillation pads to Joseph and said, "Let's attach these on and we can monitor," Joseph said, "No" because the preparatory steps had not been taken. (NOT DISPUTED that Joseph would not use the cardiac monitor with the patient; otherwise DISPUTED, Joseph's version of events is disputed by other employees and has changed multiple times)

91. Dr. William Trimble, an African American who is the Chief of Dental Service, came to where Patient 3 was being treated and recalls "some concern" between Joseph and others about whether there should have been "EKG leads placed on [Patient 3] or something of that nature." (NOT DISPUTED)

92. Joseph was calm; she did not speak disrespectfully to anyone on the team or attempt to prevent them from discussing treatment options. (NOT DISPUTED)

93. In a May 10, 2018, email to Bates and Albito, Lewis made multiple misrepresentations, intended to reflect negatively on Joseph, about information provided to her by Trimble, including that he asked Lewis "why they did not hook [Patient 3] up to a monitor." (DISPUTED that Lewis made multiple misrepresentations; NOT DISPUTED that Trimble denies asking why Patient 3 was not hooked up to a monitor)

94. Trimble, after reviewing the email, said, "[T]his does not look like what I said at all;" Trimble did not ask Lewis why the team had not hooked Patient 3 up to a monitor. (NOT DISPUTED)

95. Per ACLS guidelines and protocols, use of a monitor is not mandatory when initially evaluating someone with chest pain. (DISPUTED, this claim is disputed by multiple physician witnesses)

96. The VA's final determination regarding this case was that there were no findings to support substandard care, professional incompetence or professional misconduct and "the Standard of Care was met." (DISPUTED – this is a mischaracterization of VA processes)

97. On July 9, 2018, Joseph was notified, in a letter from Dr. John MacMaster, that a Summary Review Board (SRB) would be held to review allegations listed in a May 21, 2018, notification to Joseph of the suspension of her clinical privileges. (NOT DISPUTED)

98. MacMaster, a primary care physician, was appointed the head of Joseph's Summary Review Board. (NOT DISPUTED)

99. MacMaster had never before been on an SRB, received no training regarding how to conduct an SRB, and did not review policies regarding how to conduct an SRB. (NOT DISPUTED)

100. MacMaster sent essentially the same letter on July 16, 2018, changing the date of the Board meeting to July 30, 2018. (NOT DISPUTED)

101. Both letters from MacMaster also said, "If an initial determination is made by the [Board] that the reason(s) for your separation and subsequent revocation of privileges resulted from substandard care, professional misconduct or professional incompetence, you will be given an opportunity for a fair hearing and appeal to determine whether or not the reason(s) for the revocation of your privileges should be reported to the National Practitioner Data Bank (NPDB) . . . If a final determination is made that the revocation did result from substandard care, professional misconduct or professional incompetence, the revocation (and the summary suspension of your privileges, if applicable) will be reported to the [NPDB]." (NOT DISPUTED)

102.    A Summary Review Board of a physician must have at least three members, the members must be physicians, and "at least one of them should have expertise similar to the person being reviewed." (DISPUTED, *see* Defendant's Reply Brief, Section D)

103.    Joseph's SRB was comprised of three white male doctors (MacMaster, a family practice physician; Nazzareno Lieggio, a psychiatrist; and Mark Greenwell, a family practice physician) and one white female family practice Nurse Practitioner, Virginia Roland. (NOT DISPUTED)

104.    There was no hospitalist (Joseph's specialty) on the Board. (NOT DISPUTED there was no hospitalist on the summary review board; DISPUTED that hospitalist is a medical specialty)

105.    When the Board met on July 30, 2018, Roland, the Nurse Practitioner, participated in the Board meeting and asked questions. (NOT DISPUTED)

106.    MacMaster and the Board factored in Roland's opinions when making the final decision of the SRB. (NOT DISPUTED)

107.    MacMaster agreed that it was "possible" the Board could have come a different conclusion if the fourth member of the board had been a physician. (NOT DISPUTED)

108.    On July 31, 2018, Edward Graham, an HR specialist, emailed Stanley Weller, a VA employee relations specialist, and asked, "Have we ruined the SRB process by having a nurse practitioner on the Board? Can we salvage the process if the NP does not sign as a member?" (NOT DISPUTED)

109.    On August 1, 2018, Graham emailed Roland, stating, in part, the following: "SRB members must be at the same grade and level or higher than the employee being reviewed. Since the Board still had three qualifying members, the recommendation reached remains valid; however, you will not be asked to sign the board action form." (NOT DISPUTED)

110.    It was an error to have Roland on the board; she did not meet the criteria for being a member of the board. (DISPUTED, *see* Defendant's Reply Brief, Section D)

111.    A "Board Action" dated July 30, 2018 said the Board was recommending Joseph's removal based on conclusions that she had

"exercised poor medical judgment" in the cases involving Patients 1, 2, and 3. (NOT DISPUTED)

112.     In a letter dated August 3, 2018, Bates notified Joseph that Bates had accepted the Board's recommendation. (NOT DISPUTED)

113.     The letter again notified Joseph of her right to "a final determination" following a "fair hearing and appeal" regarding reporting to the NPDB. (NOT DISPUTED)

114.     There have been no instances, other than Joseph's, in which Bates was involved in removing a physician for reasons of clinical competence. (DISPUTED – the cited transcript testimony shows Bates was involved in removing a radiologist for suspected clinical incompetence, but the radiologist choose to resign)

115.     Prior to the SRB, the VA asked Dr. Richard Schildhouse, Section Chief, Hospital Medicine, at the VA Ann Arbor Healthcare System, to review the cases involving Patient 1 and Patient 2. (NOT DISPUTED)

116.     On June 19, 2018, Schildhouse emailed Bates with conclusions he had reached regarding his chart review of the two cases. (NOT DISPUTED)

117.     For Patient 1, Schildhouse wrote, "I would give this a 3 using the peer review system metric;" and for Patient 2, he wrote, "the care given appears to be a level 3." (NOT DISPUTED)

118.     Peer reviews result in findings of Level 1 ("most providers would do the same management"), Level 2 ("some providers will do it differently, some will do the same"), or Level 3 ("all providers would do it differently"). (NOT DISPUTED that this is a colloquial explanation of the standards)

119.     Level 1, 2, and 3 designations are only used in the context of peer reviews. (DISPUTED – the cited testimony is opinion with no objective supporting evidence)

120.     Joseph considered Schildhouse's review equivalent to a "peer review," even though Schildhouse is not part of the formal peer review system at Lutz. (NOT DISPUTED that Joseph held this opinion; DISPUTED that the review was part of the peer review process regardless of Joseph's opinion)

121.     Bates said Schildhouse's review "was not a formal process" and was more of "a curbside consult." (NOT DISPUTED)

122.     She said there are no policies or procedures regarding this type of informal outside review or when it should be used; and she had used an outside review in only one other instance. (NOT DISPUTED)

123.     Joseph exercised her right to a "fair hearing and appeal" regarding reporting to the NPDB, and the results of that hearing and appeal were sent to Bates and Albito on October 26, 2018 by the Chairperson of the panel, Gregory Trudell, a primary care doctor at Lutz. (NOT DISPUTED)

124.     The panel was comprised of Trudell; and Doctors Jambunathan Ramanathan and Abdo Alward, both hospitalists at the VA's John D. Dingell VA Medical Center. (NOT DISPUTED)

125.     Each of the panel members reviewed the same three cases reviewed by the SRB "independently prior to October 11, 2018;" met with Joseph; presented concerns and questions to her during the review meeting; and Trudell interviewed "several staff members" at Lutz "for clarification of information" provided by Joseph, and then shared the results of those interviews with the other two panel members. (NOT DISPUTED)

126.     The panel members "unanimously agreed that Dr Joseph's clinical privileges based on the above cases do not warrant revocation. There were no findings during this review to support substandard care, professional incompetence or professional misconduct. Therefore, no report to the [NPDB] or State Medical Board is required." (NOT DISPUTED)

127.     For all three cases, the panel said "the Standard of Care was met;" and if the cases were a Peer Review, the cases involving Patients 1 and 3 would be Level 1; and the case involving Patient 2 would be Level 2 (Systems Issue). (NOT DISPUTED)

128.     The nursing staff at Lutz is predominantly white. (NOT DISPUTED)

129.     As nurse manager, approximately 50 nurses reported to Tokarski, of whom "probably four or five" were African- American; none were of South Asian or Indian national origin. (NOT DISPUTED)

130.     Tokarski is white. (NOT DISPUTED)

131.    Joseph met Albito in 2012 when Albito was also an urgent care physician; they "sat right next to each other." (NOT DISPUTED)

132.    On more than one occasion when they were colleagues, Albito warned Joseph that her skin color made her a target (scratching his left hand with the index finger of his right hand and saying, "Angela, it's about this." (DISPUTED, this claim is disputed by Albito, who has no memory of ever making the gesture and says he would not tolerate discrimination in the hospital. *See* ECF No. 27-23, PageID.543-544, at 204:8-205:21.)

133.    Joseph understood that Albito, by his hand motions, was telling her "it was a matter of color or ethnic origin." (DISPUTED, this claim is disputed by Albito, who has no memory of ever making the gesture and says he would not tolerate discrimination in the hospital. *See* ECF No. 27-23, PageID.543-544, at 204:8-205:21.)

134.    One occasion was on or around October 20, 2016; Albito performed "the hand scratching motion" and said, "She [referring to another doctor] is white, and the nurses are all white, they will listen to her, and you are not." (DISPUTED, this claim is disputed by Albito, who has no memory of every making the gesture and says he would not tolerate discrimination in the hospital. *See* ECF No. 27-23, PageID.543-544, at 204:8-205:21.)

135.    In his EEO affidavit, Albito answered "yes" when asked if Joseph had ever indicated to him or anyone in management that she was being harassed or subjected to a hostile work environment; and he then said Joseph told him, "It's because of the color of my skin or something like that." (NOT DISPUTED)

136.    Albito said this occurred when he first asked Joseph for an explanation regarding the three cases. (NOT DISPUTED)

137.    Tokarski believes Joseph's race is Indian and that Joseph is of "Indian descent, origin;" She has observed that Joseph is "dark-skinned." (NOT DISPUTED)

138.    Tokarski "had [ ] very hostile and negative behavior towards [Joseph]." (DISPUTED, this is a statement of opinion by Joseph that is denied by Tokarski, who testified that she rarely interacted with Joseph. *See* ECF No. 30-31, PageID.1054, at 85:23.)

139.     Tokarski was hostile toward Joseph for more than personal reasons; Tokarski "behaved negatively towards people of color." (DISPUTED, this is a statement of opinion by Joseph that is denied by Tokarski)

140.     Tokarski was instrumental in engineering the exit of a black nurse manager named Archia Jackson. (DISPUTED, this is a statement of opinion by Joseph that is denied by Tokarski and Defendant. Jackson resigned after an independent VA investigation found she violated multiple VA policies related to patient privacy and other issues)

141.     Bates's description of Joseph as "nasty and belligerent" had a racial component; "nasty" is a stereotypical description of women of color. (NOT DISPUTED, this is a Joseph's opinion)

142.     Archambault was biased against Joseph due to Joseph's ethnicity or national origin; she was hostile, distant, and aloof toward Joseph. (DISPUTED, this is a statement of opinion by Joseph that is denied by Archambault)

143.     Asked about Joseph's race, Archambault said, "I didn't ever really think about what race she is or where she's from, you know. I never thought about it." (NOT DISPUTED)

144.     She added, "I know she's not white, Caucasian." (NOT DISPUTED)

145.     Asked what she considered to be Joseph's race, Lauria said, "I don't know. I guess I never thought of it. Indian?" (NOT DISPUTED)

146.     She described Joseph's skin color as "tan." (NOT DISPUTED)

147.     Some of the nursing staff believed Joseph was black. (DISPUTED, this is a statement of opinion by Joseph with no supporting basis)

148.     Joseph's boyfriend, who is African American, visited Joseph at Lutz. (NOT DISPUTED)

149.     Tokarski was present; after her boyfriend left, Joseph heard some of the urgent care nurses saying, "Oh, we didn't know she [Joseph] was black." (DISPUTED that Tokarski was present; this is disputed by Tokarski. NOT DISPUTED that Joseph claims she heard nurses make this statement and that she now cannot identify those nurses. *See* ECF No. 30-3, PageID.747, at 111:8-112:3)

150.    Three African American Lutz employees filed EEO complaints against Tokarski alleging racial discrimination and a hostile work environment (Mikayla West, Crystal Alexander, and Mikailu Sorie). (NOT DISPUTED)

151.    Lewis has been the subject of two EEO complaints, one by an African American (Mary Jackson) alleging race discrimination. (NOT DISPUTED)

152.    Bates was named as the responding management official in one EEO complaint, filed by Lutz's former Chief of Pharmacy, whose skin color Bates described as "brown;" the complaint alleged age discrimination. (NOT DISPUTED)

153.    Lewis and Tokarski worked "as a coordinated team." (NOT DISPUTED that this is Joseph's opinion)

154.    Tokarski, in February or March 2018, rented a house from Lewis and her husband about a mile from Lewis's house. (NOT DISPUTED)

155.    When Lewis told Joseph that Lewis was renting a house on her farm to Tokarski, Joseph knew that she [Joseph] "was going to be in trouble" because Tokarski "had been very hostile towards [Joseph]" and "other people of color in the hospital, including Sorie, and Joseph "had been forewarned that [she] needed to watch [her] back by other nurses," including Janet Schuster. (NOT DISPUTED, this is Joseph's opinion, except for the statement by Schuster, which is DISPUTED as hearsay and inadmissible)

156.    After Tokarski moved into a house on Lewis's property, Lewis started saying to Joseph, "I couldn't catch your call because I was . . . just over at [Tokarski's], we were having a few drinks." (DISPUTED, this is a contested fact, disputed by Lewis)

157.    Lewis would say things like, "I'm just a good old redneck," which Joseph interpreted as Lewis "letting [Joseph] know what [Lewis's] understanding of race relations [was]." (NOT DISPUTED that Joseph had opinions about statements Lewis made; DISPUTED that Lewis made that statement as stated, also DISPUTED as hearsay)

158.    Lewis also said, "I can't be prejudice[d]. I had a black roommate." (ADMITTED)

159.     Lewis was a "very good friend" of Lutz nurse Paulette Shrumkowski (phonetic), who made inappropriate comments, including, "My granddaddy always said there is a [N-word] in those back woods" and Joseph knew Lewis and Shrumkowski "had a shared experience like that." (DISPUTED, by Lewis that Paulette Shrumkowski ever made such a statement; ADMITTED that Lewis is friends with Shrumkowski)

160.     Joseph and Lewis once discussed a patient who was "not answering a question that [Joseph] was asking," and Lewis said, "Oh, you know, that's not uncommon. Black people usually don't answer questions directly." (DISPUTED, this is a contested fact, disputed by Lewis)

161.     The relationship between doctors and nurses should be respectful and collaborative but "[u]ltimately the physician in charge of the patient care is responsible for the decision-making and owns the decision and the outcome." (NOT DISPUTED)

162.     Between April and May 2018, Lewis began to monitor Joseph's cases closely. (NOT DISPUTED, that this is Joseph's opinion)

163.     In a September 5, 2018, email to Tokarski, Albito asked her to send him the "list of cases you sent me the past year on concerns re: Dr. J [Joseph] not including the ones currently reviewed or Peer Reviewed." (NOT DISPUTED)

164.     There is a peer review process at all VA facilities. (NOT DISPUTED)

165.     At the two other VA facilities at which Joseph had worked, she had never been subject to a peer review. (NEITHER CONFIRMED NOR DISPUTED, Peer review is a privileged process and VA counsel will not confirm or deny facts within the agency's possession about any physician's history of peer reviews)

166.     At Lutz, between November 2015 and April 2, 2018, she was the subject of "two or three." (NEITHER CONFIRMED NOR DISPUTED, Peer review is a privileged process and VA counsel will not confirm or deny facts within the agency's possession about any physician's history of peer reviews)

167.     After April 2, 2018, she was the subject of "four or five." (NEITHER CONFIRMED NOR DISPUTED, Peer review is a privileged process and

VA counsel will not confirm or deny facts within the agency's possession about any physician's history of peer reviews)

168.    Bates told Joseph, "I know there is a nursing problem, but if you say something to one of them, they all just band together." (NOT DISPUTED)

169.    In a summary of fact-finding interviews regarding the treatment of Patient 3, one or more nurses, including Misty Lauria (Jacobs) falsely claimed that Joseph could not read a monitor or EKG. (NOT DISPUTED, the nurse still holds this opinion)

170.    In the same summary, Lauria (Jacobs) said she "almost left" the scene when Joseph arrived to care for Patient 3 because she questioned Joseph's competence. (NOT DISPUTED)

171.    When interviewed about Patient 3, Archambault said that, on one occasion (in a case not reviewed by the Board), Joseph wanted to "fully bag" a patient. (NOT DISPUTED)

172.    Archambault disagreed, so she only pretended to do it. (NOT DISPUTED)

173.    Bates said this was "a horrible thing to say." (NOT DISPUTED)

174.    Joseph had to make a complaint about "a patient incident" and was talking, in Tokarski's presence, to the nurse who was involved; as Joseph walked out of the room, she heard Tokarski say "that bitch needs to be fired," referring to Joseph. (DISPUTED, this is a contested fact, disputed by Tokarski)

175.    Tokarski caused Joseph to be investigated for a HIPAA complaint. (DISPUTED, this is a contested fact, disputed by Tokarski and Defendant)

176.    Tokarski initiated a March 30, 2018 peer review of Joseph; Lewis told Joseph that Tokarski had initiated the review. (DISPUTED, this is a contested fact, disputed by Tokarski and Lewis).

177.    Lauria (Jacobs) complained in writing about Joseph's patient care "five to eight" times. (NOT DISPUTED)

178.    Mikailu Sorie, who is black and was born in Sierra Leone, "was under investigation" in September 2017 and detailed to urgent care, as a staff registered nurse, during the investigation. (NOT DISPUTED)

179.     Sorie reported to Tokarski while he was detailed to urgent care. (NOT DISPUTED)

180.     Sorie believed that Tokarski was discriminating against him during his detail because "[s]he was extremely hostile and she treated [him] differently." (NOT DISPUTED that Sorie holds this opinion)

181.     On December 10, 2017, Joseph emailed Bates about Sorie (copying Sorie on the email), saying she "was very disturbed to learn that he is being investigated from what I have heard from several people on, 'trumped up charges, that he did not do, but because he pissed off people at the top, and now he has been sent down to Urgent Care so Chris Tokarski can break him.' I was shocked, I asked why no one has spoken up, and they say, it is 'because they are picking on him now, and they will do it to me next.' . . . In other words they are afraid of retaliation." (NOT DISPUTED)

182.     She referred to Sorie "growing up very poor in a village in Sierra Leone," and praised him as a "very honest, decent person" and "very solution oriented." (NOT DISPUTED)

183.     She said his treatment was "[v]ery sad for our working environment." (NOT DISPUTED)

184.     Joseph told Lewis and Albito about her email. (NOT DISPUTED that Joseph told Lewis; DISPUTED that Joseph told Albito, this is a contested fact disputed by Albito. *See* ECF No. 27-23, PageID.539, at 187:18-188:18.)

185.     In her email, Joseph was trying to tell Bates that "this was another example of mistreatment and hostility towards people of color. . . . without saying that he's black." (DISPUTED, the document speaks for itself)

186.     She referred to Sorie's national origin "to let Dr. Bates know that there was discriminatory behavior," even though she is "not saying it directly." (DISPUTED, the document speaks for itself)

187.     Sorie believed that Joseph's email to Bates was "in opposition to what [Joseph] believed was retaliatory discrimination" against Sorie. (DISPUTED, the document speaks for itself)

188.     Tokarski, because of Joseph's statements and her discussion with the nursing staff, knew that Joseph supported Sorie though Tokarski did not know that Joseph had written the email to Bates. (DISPUTED, this is a

contested fact, disputed by Tokarski; NOT DISPUTED that Tokarski had no knowledge of Joseph's email regarding Sorie)

189.     Joseph said, "The upper management, all of them knew. They just talked, they gossiped. That's the culture." (NOT DISPUTED that this is Joseph's opinion)

190.     Lewis knew that Joseph had been supportive of Sorie and thought the investigation was unfair. (NOT DISPUTED)

191.     Lewis told Albito that Joseph was concerned about Sorie's treatment. (NOT DISPUTED)

192.     In late 2017, Joseph responded to a pager alert and Gabriel Mirelez, a Hispanic nurse's aid, was there when Joseph arrived. (NOT DISPUTED)

193.     Mirelez said, "I think [the patient] fell out of bed, but I'm not sure exactly what happened." (DISPUTED, this is a hearsay statement)

194.     Joseph examined the patient and it "appeared to [her] more as if [the patient] had crawled out of bed and sat down." (NOT DISPUTED)

195.     Joseph was contacted by HR and asked "questions pertaining to a grievance" and realized it related to Mirelez. (NOT DISPUTED)

196.     Joseph described what happened to the HR representatives. (NOT DISPUTED)

197.     She then learned that Mirelez, who had been suspended, was back on duty. (NOT DISPUTED)

198.     Mirelez told Joseph, "Thank you so much." (DISPUTED, this is a hearsay statement)

199.     Lewis was aware that Joseph supported Mirelez because she overheard Lutz employee Jane Vater tell Lewis, "I don't know what [HR] is doing over here talking to Dr. Joseph. She doesn't know what went on." (DISPUTED, this is a contested fact, disputed by Lewis)

200.     Management at Lutz "cared that [Joseph] always stood up for minorities" and she "was known to speak on behalf of" people other than Mirelez and Sorie. (NOT DISPUTED that this is Joseph's opinion)

201.     Dr. Galina Gladka is a white female of Ukrainian descent who came to Lutz as a Canadian citizen working as a fee-based provider. (NOT DISPUTED)

202.     The VA "wanted [Joseph] out and Dr. Gladka in." (DISPUTED that there is any objective evidence to support this statement, it is denied by Dr. Albito, Dr. Bates and Defendant; ADMITTED that it is Joseph's opinion)

203.     In April 2018, Gladka "began indicating that she wanted a full-time position." (NOT DISPUTED that at some point in early 2018, Dr. Gladka expressed in interest in a staff physician position)

204.     Albito told Joseph that "there were other doctors that wanted [Joseph's] position." (DISPUTED, this is a contested fact, disputed by Albito)

205.     Lewis did not recall who the VA hired to replace Joseph but said "it might have been Dr. Gladka." (NOT DISPUTED)

206.     Lewis said that, at some point in 2018, Gladka transitioned to a full-time hospitalist after she became a U.S. citizen. (NOT DISPUTED)

207.     In his EEO affidavit, when asked whether he had hired anyone to replace Joseph, Albito said he had made an offer to Dr. Tom Abalo, who is of Chinese national origin. (NOT DISPUTED)

208.     But Albito said Abalo was not hired to replace Joseph. (NOT DISPUTED)

209.     He said, "we don't have a spot specifically for an opening from Dr. Joseph's position." (NOT DISPUTED)

210.     Albito said Gladka, like Abalo, filled a position equivalent to Joseph's but did not fill Joseph's position. (NOT DISPUTED)

211.     After her removal, Joseph applied to return to the Detroit VA to work in the emergency room in a fee-for-service position; she did not get the position. (DISPUTED, there is no evidence that Joseph formally apply for any position at the Detroit VA after her termination)

212.     Joseph spoke to a recruiter who told her that it would be "very difficult" for a physician who had been suspended to get credentialed. (NOT DISPUTED)

213.    Joseph applied for several positions but did not proceed after she received the credentialing packet that required her to disclosed whether she had ever been suspended. (NOT DISPUTED)

214.    She "did not want [it] to get out in the market that [she] had been suspended wrongfully for things that [she] did not do." (NOT DISPUTED)

215.    Because she was trained in acupuncture, Joseph leased office space and started her own acupuncture practice. (NOT DISPUTED)

216.    As of March 3, 2020, Joseph's practice had about five patients. (NOT DISPUTED)