UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANGELA JOSEPH,

          Plaintiff,              Case No. 5:19-cv-10828
                                        District Judge Judith E. Levy
v.                                 Magistrate Judge Anthony P. Patti

SECRETARY OF THE
DEPARTMENT OF VETERANS
AFFAIRS,

          Defendant.
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION TO GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT UNDER FED. R. CIV. P. 56(a) (ECF No. 27)

**I.**    **RECOMMENDATION**:  The Court should **GRANT** Defendant's motion for summary judgment (ECF No. 27) and dismiss the case.

**II.**    **REPORT**

      **A.**    **Background**

           **1.**    **Factual Background**

      Plaintiff Angela Joseph filed this lawsuit against her former employer, Defendant Secretary of the Department of Veterans Affairs, on March 20, 2019, claiming race and national origin discrimination as well as retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.  (ECF No. 1, PageID.8-9, ¶¶ 43-57.)  The factual background of the case, gleaned from

Plaintiff's complaint and the evidence attached to the summary judgment briefing, is as follows.

Plaintiff, who is of Indian descent, became a full-time physician at the Aleda E. Lutz Veterans Affairs Medical Center in 2016 and served as a hospitalist until her termination in August 2018.  (ECF No. 1, PageID.2, 7, ¶¶ 8-9, 40; Exhibit 1, Savino Dep. Trans., p. 21, ECF No. 27-2, PageID.160.)  Full-time VA physicians serve a two-year probationary period.  (Exh. 1, pp. 20-21, ECF No. 27-2, PageID.159-160.)  *See* 38 U.S.C. § 7403.[1]  The events which ultimately led to Plaintiff's termination as a probationary physician involved her care of three patients in May 2018.

### a.    Patient 1

Plaintiff saw "Patient 1" at Lutz on the morning of May 7, 2018, and again that afternoon.  (Exhibits 2, Plaintiff's Dep. Trans., pp. 273-276, ECF No. 27-3, PageID.230, ECF No. 30-3, PageID.766; Exhibit 12, Plaintiff's Notes, ECF No. 30-13, PageID.872-875.)  He had a history of COPD.  (Exhibit 3, Discharge Summary, ECF No. 27-4, PageID.266.)  According to respiratory therapist Noelita Cicinelli, at approximately 4:15 p.m., she received a call from Plaintiff with an

---

[1] Plaintiff challenges Defendant's calculation of her probationary period in her response to Defendant's motion for summary judgment (ECF No. 30, PageID.691-692), which will be addressed in greater detail below.

order to place Patient 1 on a non-rebreather mask with oxygen and to perform an arterial blood gas (ABG) test.  (Exhibit 6, Cicinelli Decl., ECF No. 27-7, PageID.305, ¶ 7.)  Cicinelli suggested instead that Plaintiff place Patient 1 on BiPap, as it would be more appropriate for a COPD patient than a non-rebreather mask would, and Plaintiff then placed the suggested order.  (Exh. 6, ECF No. 27-7, PageID.305-306, ¶¶ 8-12.)  In contrast, Plaintiff's notes regarding her care of Patient 1 indicate simply that she ordered the ABG and BiPap, and she testified to the same.  (Exh. 2, pp. 281-282, ECF No. 30-3, PageID.768; Exh. 12, ECF No. 30-13, PageID.873.)  Ultimately, Cicinelli filed a "Report of Contact" criticizing Plaintiff's decision to originally order a non-rebreather mask.  (Exh. 6, ECF No. 27-7, PageID.306, ¶ 14; Exhibit 7, Cicinelli Report of Contact, ECF No. 27-8.)

### b.    Patient 2

Plaintiff treated "Patient 2," a male veteran in his eighties suffering from leukemia, over the course of two days on May 7 and 8, 2018.  (Exh. 2, pp. 295-298, ECF No. 27-3, PageID.235-236; Exhibit 8, Patient 2 Medical Records, ECF No. 27-9, PageID.311.)  Patient 2 presented at Lutz's transfusion clinic on May 7 at which time Plaintiff ordered two units of blood because Patient 2's hemoglobin levels indicated heavy bleeding.  (Exh. 2, p. 299, ECF No. 27-3, PageID.236; Exh. 8, ECF No. 27-9, PageID.382-384.)  Unbeknownst to Plaintiff, Nurse Theresa Thompson discharged Patient 2 that evening (Exh. 8, ECF No. 27-9, PageID.379),

prompting Plaintiff to call and advise that he return to Lutz the next day due to his "low…inadequate" hemoglobin levels (Exh. 2, pp. 307-311, ECF No. 27-3, PageID.238-239).  When Patient 2 returned that next day, he passed rusty stool, which indicates new bleeding.  (Exh. 2, p. 318, ECF No. 27-3, PageID.241; Exh. 8, ECF No. 27-9, PageID.374.)  Nurse Andrea Jimenez-Traubenkraut's notes from that day indicate that she informed Plaintiff of Patient 2's rusty stool (Exh 8, ECF No. 27-9, PageID.374), but at her deposition, Plaintiff denied such knowledge (Exh. 2, p. 317, ECF No. 27-3, PageID.241).

Plaintiff testified, in contrast, that the white urgent care physician on duty when Patient 2 arrived at the transfusion clinic asked that she admit Patient 2, despite his desire not to be admitted.  (Exh. 2, pp. 33-36, ECF No. 30-3, PageID.736; Exhibit 13, Plaintiff's Presentation to the Professional Standards Board, ECF No. 30-14, PageID.915-922; Exhibit 15, Plaintiff's Notes RE: Patient 2, ECF No. 30-16.)  According to Plaintiff, chief of medicine Dr. Anthony Albito advised her to follow the physician's directive, and when she recounted the events to assistant chief of medicine Sally Lewis, a white nurse-practitioner, Lewis said: "'Dr. Albito is trying to protect you.  The physician that you're dealing with is -- was a former chief over here, and the nurses will all follow her, and she is white and you are not.'"  (Exh. 2, pp. 33-36, ECF No. 30-3, PageID.736.)

4

On May 10, 2018, nurse Thompson, who had discharged Plaintiff on May 7, e-mailed nurse manager Christina Tokarski to question Plaintiff's decision not to admit Patient 2 given the seriousness of his condition.  (Exhibit 10, Thompson E-mail Exchange, ECF No. 27-11, PageID.395-396.)  Nurse manager Tokarski forwarded the e-mail to Sally Lewis without comment.  (Exh. 10, ECF No. 27-11.)

### c.     Patient 3

Finally, on the afternoon of May 8, 2018, "Patient 3," a Lutz dental unit employee, suffered a heart attack and a Code Blue was called, for which Plaintiff was in charge.  (Exhibit 11, Patient 3 Medical Records, ECF No. 27-12, PageID.399-402.)  According to handwritten notes on the Code Blue/Medical Emergency Report, Plaintiff was asked multiple times if Patient 3 should be placed on a heart monitor, and Plaintiff said "no."  (Exh. 11, ECF No. 27-12, PageID.399.)  However, Plaintiff testified that, in actuality, she refused the request of respiratory therapist Cathy Archambault and nurse Cheryl Hirn to use an automated external defibrillator (AED) because the proper preparatory steps had not been taken.  (Exh. 2, pp. 353-356, ECF No. 30-3, PageID.781.)

That same day, respiratory therapists Cicinelli and Archambault filed a Report of Contact with their supervisor Rhonda Muhammad, challenging Plaintiff's conduct during Patient 3's Code Blue.  (Exhibit 12, Report of Contact, ECF No. 27-13; Exhibit 13, Muhammad E-mail, ECF No. 27-14.)  Muhammad

forwarded the report to Dr. Albito, Sally Lewis, and patient safety coordinator Sara Schroeder. (Exh. 13, ECF No. 27-14.) On May 9, nurse practitioner Carol Little, who also responded to Patient 3's Code Blue, filed her own Report of Contact, challenging Plaintiff's conduct. (Exhibit 14, Little Report of Contact, ECF No. 27-15.) And, finally, nurse Misty Jacobs e-mailed nurse manager Tokarski to complain of Plaintiff's failure to attach Patient 3 to a monitor. (Exhibit 15, Jacobs E-mail, ECF No. 27-16.)

On May 10, 2018, Sally Lewis, then acting chief of medicine while Dr. Albito was away, e-mailed Dr. Barbara Bates, the Saginaw VA chief of staff, regarding Plaintiff's care of Patients 1, 2, and 3, and recommended that Plaintiff be suspended pending a full clinical review. (Exhibit 19, Lewis E-mail, ECF No. 27-20.) In so doing, she referenced Dr. William Trimble as a source of information regarding the Code Blue. (Exh. 19, ECF No. 27-20, PageID.470.) However, Dr. Trimble testified that Sally Lewis incorrectly summarized his statements on the incident in that e-mail. (Exhibit 19, Trimble Dep. Trans., pp. 27-32, ECF No. 30-20, PageID.993-994.)

Dr. Bates, rather than immediately suspend Plaintiff, asked two employees—Carol Dopp and Dr. Kathy Lewis—to gather facts regarding the Code Blue incident. (Exhibit 16, Bates Dep. Trans., pp. 46-48, ECF No. 27-17, PageID.424.) Dopp and Dr. Lewis interviewed employees involved in the

6

incident, but did not interview Plaintiff, and drafted and e-mailed a report to Dr. Bates on June 18, 2018. (Exh. 16, pp. 46-48, ECF No. 27-17, PageID.424; Exhibit 20, Code Blue Report, ECF No. 27-21; Exhibit 21, Dopp E-mail, ECF No. 27-22.)

At the request of Dr. Bates and Sally Lewis, Dr. Albito reviewed the complaints made against Plaintiff upon his return. (Exh. 16, pp. 48-49, ECF No. 27-17, PageID.424-425; Exhibit 22, Albito Dep. Trans., pp 82-83, ECF No. 27-23, PageID.513.) In so doing, he drafted a memorandum to Dr. Bates on May 16, 2018, recommending that Plaintiff be put on administrative suspension effective immediately pending an "Administrative Board Investigation." (Exh. 22, pp. 65, 83-85, ECF No. 27-23, PageID.509, 513-514; Exhibit 23, Albito Memo, ECF No. 27-24.)

Dr. Bates then arranged for a review of Plaintiff's treatment of Patients 1 and 2 by Dr. Richard Schildhouse, section chief for hospital medicine at the Ann Arbor VA (Exh. 16, pp. 55-56, ECF No. 27-17, PageID.426), asked Dr. Albito to speak with Plaintiff about the incidents (Exh. 22, pp. 85-86, ECF No. 27-23, PageID.514; Exhibit 24, Bates E-mail Chain, ECF No. 27-25, PageID.552), and spoke with Plaintiff personally about the incidents (Exh. 16, pp. 60-61, 64-65, ECF No. 27-17, PageID.427-429). In her affidavit, Dr. Bates described Plaintiff's demeanor during these conversations as "nasty" and "belligerent," comments she acknowledged as rude during her deposition. (Exh. 16, pp. 60-61, 64-65, ECF No.

7

27-17, PageID.427-429.) Ultimately, Dr. Bates suspended Plaintiff's privileges, relying heavily, she testified, on Dr. Albito's opinions regarding Plaintiff's conduct during the incidents. (Exh. 16, pp. 99-100, ECF No. 27-17, PageID.437.) Plaintiff was informed of the suspension and pending investigation of her patient care in a May 21, 2018 letter. (Exhibit 25, Sraon Letter, ECF No. 27-26.)

On June 19, 2018, Dr. Schildhouse sent Dr. Bates the results of his review, labeling Plaintiff's care of Patients 1 and 2 as a "level 3" using the peer review system metric, which indicates that Plaintiff failed to meet the Standard of Care. (Exh. 22, p. 202, ECF No. 27-23, PageID.543; Exhibit 26, Schildhouse Review E-mail, ECF No. 27-27.) Dr. Bates forwarded the review to Dr. Albito, stating that the conclusion provided "cause to seriously look at a summary Review Board" (SRB) to evaluate Plaintiff's conduct (Exhibit 27, E-mail, ECF No. 27-28, PageID.563), which Dr. Albito then requested on July 2, 2018 with Dr. Bates's approval (Exhibit 28, Albito Memo, ECF No. 27-29).

Plaintiff received notification of the SRB hearing on July 16, 2018 (Exhibit 29, SRB Notice, ECF No. 27-30), and was subsequently provided the evidence file that would be before the SRB (Exhibit 30, Evidence File Index, ECF No. 27-31). The SRB's hearing notes indicate that it interviewed Sally Lewis and Plaintiff, accompanied by an attorney, and reviewed each of the incidents at issue, ultimately recommending Plaintiff's termination. (Exhibit 31, SRB Notes, ECF No. 27-32;

8

Exhibit 33, SRB Action, ECF No. 27-34.)  In so doing, it took issue with Plaintiff's care of Patients 1, 2, and 3.  (Exh. 31, ECF No. 27-32, PageID.574; Exh. 33, ECF No. 27-34; *see also* ECF No. 27, PageID.136.)  The SRB also reviewed a fourth incident, not discussed above, but it found no issue with Plaintiff's care in that incident.  (*See* Exh. 33, ECF No. 27-34, PageID.660.)

Dr. Bates approved and signed the SRB's recommendation on August 3, 2018 (Exh. 33, ECF No. 27-34, PageID.661), and sent Plaintiff a letter terminating her employment (Exhibit 34, Termination Letter, ECF No. 27-35).  The letter explained that Plaintiff would "receive information via a separate notice regarding [her] opportunity for a fair hearing and appeal *to determine whether or not the reason(s) for the revocation of [her] privileges should be reported to the National Practitioner Data Bank (NPDB)* in accordance with VHA Handbook 1100.19 and VHA Handbook 1100.17."  (Exh. 34, ECF No. 27-35, PageID.663 (emphasis added).)  Plaintiff did appeal, and the Appeals Board determined that she met the Standard of Care in all three cases; thus, she was not reported to the NPDB. (Exhibit 14, Appeals Board Panel Results, ECF No. 30-15.)

Plaintiff filed the instant lawsuit on March 20, 2019, claiming race and national origin discrimination as well as retaliation in violation of Title VII.  (ECF No. 1, PageID.8-9, ¶¶ 43-57.)  She alleges that nurse manager Tokarski and Sally Lewis joined together to bring about the complaints that led to her termination

because of her race and/or national origin (ECF No. 1, PageID.5, 8, ¶¶ 26, 44-47), and that Defendant retaliated against her in response to her support of two other non-white employees who had also experienced discrimination.  (ECF No. 1, PageID.3-4, ¶¶ 15-16, 23, 53-55).

### 2.    Instant Motion

On October 1, 2021, Defendant filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56(a), asserting that Plaintiff's discrimination and retaliation claims under Title VII fail as a matter of law, and that Plaintiff did not mitigate her damages.  (ECF No. 27, PageID.139-148.)  The introduction to Plaintiff's response in opposition, filed on November 2, 2020, summarizes her arguments as follows:

> The VA's motion for summary judgment should be denied.  [Plaintiff] has established her *prima facie* cases of national origin and race discrimination, and retaliation, in violation of Title VII, and has strong indirect evidence of the VA's discriminatory intent and retaliatory animus.

> \* \* \*

> [Plaintiff], because she was nonwhite and of Indian national origin, was targeted by a clique of white nurses, led by Christina Tokarski and abetted by Sally Lewis, with a series of complaints and Reports of Contact based on false allegations regarding [Plaintiff's] decisions and actions in treating patients.  [Plaintiff's] vocal support of two nonwhite nurses also targeted by these white nurses added retaliatory animus to the ongoing discriminatory animus of the white nurses.

(ECF No. 30, PageID.690-691.)  Plaintiff also asserts in her response that she was no longer a probationary employee at the time of her termination.  (ECF No. 30, PageID.690-692.)[2]

Finally, Defendant filed a reply brief, arguing: (1) Plaintiff's disagreement with the review of her patient care does not establish pretext; (2) Plaintiff was a probationary employee at the time of her termination; (3) Defendant did not deviate from, or violate, its peer review process; (4) the SRB was properly composed; (5) the Appeals Board's ultimate finding is not evidence of pretext; and (6) Plaintiff's "cat's paw" theory of liability fails.  (ECF No. 33, PageID.1142-1148.)  On May 6, 2021, the Court held a hearing via Zoom technology and took the motion under advisement.

### B.    Standard

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the case under governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court

---

[2] I note that Plaintiff provides as Exhibit 1 to her response brief a list labeled "Defendant's Statement of Material Facts," and states by number in Footnote 1 of her brief which facts she disputes.  (*See* ECF No. 30, PageID.691, n. 1; ECF No. 30-2.)

"views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004).

"The moving party has the initial burden of proving that no genuine issue of material fact exists . . . ." *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); *cf.* Fed. R. Civ. P. 56(e)(2) (providing that if a party "fails to properly address another party's assertion of fact," the court may "consider the fact undisputed for purposes of the motion"). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The nonmoving party "must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009); *see also Lee v. Metro. Gov't of Nashville & Davidson Cty.*, 432 F. App'x 435, 441 (6th Cir. 2011) ("The nonmovant must . . . do more than simply show that there is some metaphysical doubt as to the material facts[.] . . . [T]here must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute.") (internal quotation marks and citations omitted). In other words, summary judgment is appropriate

when the motion "is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case[.] . . ." *Stansberry*, 651 F.3d at 486 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

### C.   Discussion

#### 1.   Plaintiff's claim of race and national origin discrimination

##### a.   *Prima facie* case

Plaintiff claims she suffered race and national origin discrimination in violation of Title VII when nurse Tokarski and Sally Lewis, both white, collaborated to bring about and contribute to the patient care complaints that ultimately led to her termination.  (ECF No. 1, PageID.5, 8, ¶¶ 26, 44-47.)  Where, as is the case here, discrimination claims under Title VII are based on circumstantial evidence, the burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), applies.  *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008).  "Under this framework, the plaintiff bears the initial 'not onerous' burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence."  *Id*.  "To establish a *prima facie* case of employment discrimination, a plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment decision; and (4) he was replaced by a person outside the

protected class or treated differently than similarly situated non-protected employees." *Id*.

Although Defendant does not argue that Plaintiff failed to meet her burden of establishing a *prima facie* case of discrimination for purposes of the instant motion (ECF No. 27, PageID.139), whether Plaintiff actually did so is questionable.  With regard to the fourth element, specifically, Plaintiff alleges in her complaint that Dr. Galina Gladka, a white physician and friend of Dr. Albito, was hired as her replacement.  (ECF No. 1, PageID.4, 7, ¶¶ 25, 35.)  She makes the same assertion in her response to the instant motion, referencing her own deposition testimony (Exh. 2, pp. 138-144, ECF No. 30-3, PageID.753-754), Sally Lewis's deposition testimony (Exhibit 7, Lewis Dep. Trans., pp. 68-69, ECF No. 30-8, PageID.824-825), and Dr. Albito's deposition testimony (Exhibit 6, Albito Dep. Trans., pp 145-148, ECF No. 30-7, PageID.814).

However, Plaintiff largely mischaracterizes the testimony she cites.  For instance, when asked who filled Plaintiff's position, Sally Lewis stated: "Let me think.  I might be able to -- it might have been Dr. Gladka.  No, she was already working.  I don't recall who filled that position."  (Exh. 7, pp. 68-69, ECF No. 30-8, PageID.824-825.)  Further, Dr. Albito acknowledged at his deposition statements from a previous affidavit that he offered Plaintiff's position to Dr. Tom Abalo, of Chinese descent, but clarified that although Drs. Abalo and Gladka were

14

hired for physician positions, no opening existed for Plaintiff's position specifically. (Exh. 6, pp. 145-148, ECF No. 30-7, PageID.814.) Thus, Plaintiff has essentially supported the assertion that Dr. Gladka filled her position with only her own deposition testimony. In any case, even assuming, *arguendo*, that Plaintiff has established a *prima facie* case of race and national origin discrimination, the Court should find that Defendant is entitled to summary judgment on the claim because Plaintiff has failed to demonstrate a genuine issue of fact with regard to pretext.

### b.    Pretext

If a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for the employment decision. *McDonnell Douglas*, 411 U.S. at 802. When a defendant offers such a reason, the burden shifts to the plaintiff to show that the proffered reason is merely a pretext for discrimination. *Id*. at 804. However, the burden of persuasion rests with the plaintiff at all times. *Hunter v. Sec'y of the U.S. Army*, 565 F.3d 986, 996 (6th Cir. 2009).

> Plaintiffs may establish pretext by showing that the proffered reason: "(1) has no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to warrant the adverse action." *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009) . . . . A "plaintiff may also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action

15

was its actual motivation." *White*, 533 F.3d at 393 (citation and
internal quotation marks omitted).

*Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 558 (6th Cir. 2009).

Defendant has most certainly provided a legitimate, non-discriminatory

reason for Plaintiff's termination—multiple complaints regarding her patient care

and the review of those complaints by several individuals and the SRB, which

ultimately determined that Plaintiff did not meet the Standard of Care for Patients

1, 2, or 3.  (Exh. 31, ECF No. 27-32; Exh. 34, ECF No. 27-35.)  Plaintiff offers

several arguments as to why Defendant's explanation is a pretext for

discrimination, but none are sufficiently supported by the record to establish a

genuine issue of material fact.

In her response brief, Plaintiff asserts that she:

> presented strong evidence of pretext in the VA's deviation from its
> established policy regarding the composition of an SRB—most
> notably, the VA chose no hospitalist or other member with expertise
> similar to [hers], and improperly included a Nurse Practitioner as a
> member.  It deviated from its established practice in making the
> unexplained "error" regarding the date of her appointment as a full-
> time, permanent staff physician.  And it deviated from its established
> policy or practice in its "curbside consult" with Schildhouse, rather
> than using its formal Peer Review process.  Finally, the appeal panel's
> determination that [her] care of Patients 1, 2, and 3 met the Standard
> of Care is strong evidence of pretext in the SRB's examination of
> those cases.

(ECF No. 30, PageID.711.)  The above, Plaintiff argues, supports a "cat's paw"

theory of liability:

> The VA's cat's paw liability is highlighted by the SRB's reliance on information from [Sally] Lewis (and the white nurses who targeted [Plaintiff]) regarding the three cases.  As explained in [Plaintiff's] Statement above, Lewis (and the white nurses who targeted [Plaintiff]) misrepresented [Plaintiff's] actions; this is exemplified by Lewis's false statements regarding her discussion with Trimble about Patient 3, statements which Trimble said were false.

(ECF No. 30, PageID.712.)  I will address each assertion below.

### i.    Probationary status

First, Plaintiff appears to raise the allegation regarding possible expiration of her probationary status for the first time in her response to the instant motion, rather than in her pleadings, yet Plaintiff's counsel conceded at the motion hearing that his client does not wish to challenge her status, and only raises the issue in support of her pretext argument.  Specifically, counsel stated: "For purposes of this case, we are conceding that she was treated as a probationary employee." However, even if the Court ignores this concession and runs with the proposition that she was a full-time employee, as such, she would have been a federal employee subject to an entirely different procedure, including the need to make an administrative claim and pursue her litigation in the Court of Claims.  In fact, this Court would lack any jurisdiction over Plaintiff's case, let alone the present summary judgment motion.  As a result, I see no reason for the Court to examine Plaintiff's probationary status at all, for purposes of Plaintiff's pretext argument or otherwise.  Nor do I believe that she can have it both ways: "probationary" for

17

purposes of subject matter jurisdiction and a "full-time hire" for evidentiary

purposes.[3]

### ii.  Composition of the Summary Review Board and Appeals Board decision

I turn next to Plaintiff's argument that the composition of the Summary

Review Board serves as evidence that Defendant's proffered explanation for her

termination is simply a pretext for discrimination.  VA Handbook 5021, Part III,

and VA Handbook 5005, Part II, govern employment actions involving

probationary physicians, as well as the make-up of Summary Review Boards, also

referred to as Professional Standards Boards.  (*See* Exhibit 2, Berghoff Decl. and

Attachments, ECF No. 33-3.)  VA Handbook 5005, part II, chapter three, Section

C, Part 3 states, in part: "Board members must be at a grade and level that is equal

to or higher than that of the candidate being considered.  Board membership should

also be sufficiently broad to cover the range of practice within an occupation and

where possible include all grades and levels within an occupation."  (Exh. 2, ECF

No. 33-3, PageID.1197.)  And under Section C, Part 4:

> Whenever possible, PSBs will be composed of three or five
> employees from the same occupation as the individual being
> considered.  When three or five members from the same occupation
> are not available, appropriately qualified individuals from other

---

[3] Defendants assert, in their reply brief, that the VA Board mistakenly voted to
approve Plaintiff for a full-time appointment on June 28, 2016 before she had
taken a required drug test, but corrected the mistake on October 13, 2016.  (ECF
No. 33, PageID.1142-1143.)

occupations may be appointed, provided the board is composed of a majority of the employees from the occupation involved . . . .

(Exh. 2, ECF No. 33-3, PageID.1197-1198.)

Plaintiff's SRB consisted of John C. MacMaster, a family practitioner and then supervisor of primary care at Lutz, Nazzareno Liegghio, a psychiatrist, Mark Greenwell, director of the emergency room and a family physician by training, and Virginia Rolland, a nurse practitioner. (Exhibit 23, MacMaster Dep. Trans., pp. 10, 21-24, ECF No. 30-24, PageID.1018-1019; Exh. 33, ECF No. 27-34.) Thus, three of the four board members were physicians, like Plaintiff. (*See* VA Handbook 5005, part II, chapter three, Section C, Parts 3 & 4, Exh. 2, ECF No. 33-3, PageID.1197-1198.) Plaintiff insists that the lack of a "hospitalist" calls the SRB's composition and, thus, proffered reason for termination, into question. (ECF No. 30, PageID.700.) However, she cites no provision of the VA Handbook or alternative authority containing such a requirement, and in his declaration, Human Resources Specialist Eric Berghoff stated that the three physician SRB members had employment grade levels equal to or higher than Plaintiff's on the date of her review (Exh. 2, ECF No. 33-3, PageID.1167, ¶ 16), and that "[a]lthough there is no requirement to have a physician on the board serving in the same category role as [Plaintiff], both MacMaster and Greenwell were qualified to fill a hospitalist role at the Saginaw VA facility because they met all the requirements for the job" (Exh. 2, ECF No. 33-3, PageID.1167, ¶ 17). It also bears noting that

19

"hospitalist" is a VA job category (Exh. 2, ECF No. 33-3, PageID.1167, ¶ 11), and

Plaintiff's counsel could not confirm at the hearing that "hospitalist" is considered

a specific medical specialty. [4]  Regardless, Plaintiff's counsel admitted at the

hearing that Plaintiff held no board certifications and disavowed any argument that

simply because the members of the SRB are white, the SRB was biased.

Plaintiff also takes issue with the nurse practitioner on her SRB, but did not

cite, in her response brief or at the motion hearing, any VA policy or other

authority forbidding a nurse practitioner from participating in an SRB reviewing

the care of a physician.  And, as Defendant points out in its reply brief (ECF No.

33, PageID.1145), under VA Handbook 5005, part II, chapter three, Section C, Part

4, nurse practitioner Rolland could be considered an appropriately qualified

individual from another profession (see Exh. 2, ECF No. 33-3, PageID.1197-

1198).  Furthermore, even if nurse practitioner Rolland's inclusion could be

---

[4] According to the American Board of Physician Specialties:

> A hospitalist is a physician who must master the specific skill set and
> knowledge required to treat and care for patients in the hospital.
> Many physicians choose to work primarily in hospitals and self-
> identify as hospitalists, yet they are board certified in a specialty, such
> as Internal Medicine or Family Practice Medicine, that does not
> accurately reflect their experience and level of competence in
> providing treatment, diagnosing illnesses, coordinating with other
> medical personnel, and other duties of a hospitalist.

However, the American Board of Hospital Medicine (ABHM) has made available
board certification in Hospital Medicine.  *See* https://www.abpsus.org/hospitalist/.

considered error under the circumstances at issue here, such error does not

establish a genuine issue of fact regarding pretext.  The SRB was otherwise

properly composed, as described above, and although Dr. MacMaster testified at

his deposition that had the fourth member of the SRB been a physician, it is

possible the Board's recommendation may have been different (Exhibit 23,

MacMaster Dep. Trans., p. 35, ECF No. 30-24, PageID.1021), nurse practitioner

Rolland did not sign the final recommendation; the three physicians did (Exh. 33,

ECF No. 27-34).

Nor should the Court find a genuine issue of disputed fact that Defendant's

proffered reason for termination was pretext on the basis of Plaintiff's assertions

regarding use of the VA's peer review process or the Appeals Board's decision.

Plaintiff argues that Defendant violated its own peer review process by soliciting a

consultation from Dr. Schildhouse and that the deviation is evidence of pretext.

(ECF No. 30, PageID.701-702.)  In so doing, she cites to her own testimony that

Dr. Schildhouse is not a part of the formal peer review system at Lutz (*see* Exh. 2,

pp. 245-247, ECF No. 30-3, PageID.763), and Dr. Bates's testimony that Dr.

Schildhouse's review should be considered more of a "curbside consult" than a

formal review (*see* Exhibit 11, Bates Dep. Trans., pp. 69-70, ECF No. 30-12,

PageID.861).  Again, however, Plaintiff provides no indication beyond her own

testimony that Dr. Schildhouse's consultation violated VA policy, and I fail to see

21

how affording Plaintiff an additional layer of review demonstrates pretext.  If

anything, it demonstrates an additional level of thoroughness, care, and caution

being exercised with respect to terminating her employment.  Those in authority

sought a second opinion.  Further, to any extent Plaintiff argues that the

consultation represents a differentiation, and that this differentiation in and of itself

creates a genuine issue regarding pretext, Dr. Bates testified at her deposition that

she sought similar outside review in the case of a radiologist a couple of years

prior.  (Exhibit 16, Bates Dep. Trans., pp. 69-70, ECF No. 27-17, PageID.430.)

It is also true, as Plaintiff asserts (ECF No. 30, PageID.702), that the

Appeals Board ultimately found that Plaintiff met the Standard of Care for Patients

1, 2, and 3 (Exhibit 14, Appeals Board Panel Results, ECF No. 3-15), stating:

> Panel members unanimously agreed that [Plaintiff's] clinical
> privileges based on the above cases do not warrant revocation.  There
> were no findings during this review to support substandard care,
> professional incompetence or professional misconduct.  Therefore, no
> report to the National Practitioner Data Bank or State Medical Board
> is required.

(Exh. 14, ECF No. 30-15.)  But this does not create a genuine issue of fact

regarding pretext, as the SRB independently reviewed each case, after both Drs.

Albito and Schildhouse believed such review was necessary, with input from

witnesses including Plaintiff, and made its decision with Plaintiff's *employment* in

mind, as opposed to her standing with the National Practitioner Data Bank or State

Medical Board, which deal with licensure, clinical privileges, and national

reporting.  Moreover, even if the Appeals Board determined that the SRB made a mistake, mistakes alone do not prove pretext for discrimination.  *See Sybrandt*, 560 F.3d at 559 (6th Cir. 2009) ("'[A]s long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect.'") (quoting *Majewski v. Auto. Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001)).  "'The key inquiry in assessing whether an employer holds such an honest belief is whether the employer made a reasonably informed and considered decision before taking the complained-of action.'" *Sybrandt*, 560 F.3d at 559 (quoting *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598-99 (6th Cir. 2007)).  On the basis of the facts summarized above, it is clear the SRB and Defendant did so here.

### iii.    Cat's paw

Finally, the Court should reject Plaintiff's "cat's paw" theory of liability. Plaintiff does not allege discriminatory animus on the part of any of the individuals who filed complaints related to her care of Patients 1, 2, and 3, Drs. Schildhouse or Albito, or the SRB members, and Plaintiff's counsel explicitly stated at the motion hearing that Plaintiff had no direct evidence of racial animus with respect to those individuals.  Instead, she largely relies on a cat's paw theory of liability, asserting that Dr. Bates, the ultimate decisionmaker, relied on discriminatory and retaliatory

information from nurse Tokarski and Sally Lewis.  (ECF No. 30, PageID.690,

712.)

> "In the employment discrimination context, 'cat's paw' refers to a
> situation in which a biased subordinate, who lacks decisionmaking
> power, uses the formal decisionmaker as a dupe in a deliberate
> scheme to trigger a discriminatory employment action."  *EEOC v. BCI
> Coca-Cola Bottling Co.*, 450 F.3d 476, 484 (10th Cir. 2006), *cert.
> dismissed*, 549 U.S. 1334, 127 S.Ct. 1931, 167 L.Ed.2d 583 (2007);
> *see also Arendale v. City of Memphis*, 519 F.3d 587, 604 n. 13 (6th
> Cir. 2008) ("When an adverse hiring decision is made by a supervisor
> who lacks impermissible bias, but that supervisor was influenced by
> another individual who was motivated by such bias, this Court has
> held that the employer may be held liable under a 'rubber-stamp' or
> 'cat's paw' theory of liability.").

*Roberts v. Principi*, 283 F. App'x 325, 333 (6th Cir. 2008).  "Under this theory, the

subordinate, not the nominal decisionmaker, is the driving force behind the

employment action.  When a decisionmaker acts in accordance with a retaliator's

bias 'without [him]self evaluating the employee's situation,' the retaliator 'clearly

causes the tangible employment action, regardless of which individual actually'

enforces the adverse transfer or termination."  *Id*. (quoting *Llampallas v. Mini-

Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998)).  "Imposing liability on

the employer in this context is in accord with the agency principles and polices

underlying Title VII."  *Id*.

Again, Plaintiff asserts that "because she was nonwhite and of Indian

national origin, [she] was targeted by a clique of white nurses, led by Christina

Tokarski and abetted by Sally Lewis, with a series of complaints and Reports of

24

Contact based on false allegations regarding [her] decisions and actions in treating patients." (ECF No. 30, PageID.690, 702-706.) The record, however, demonstrates otherwise. First, although Sally Lewis recommended to Dr. Bates that Plaintiff be suspended pending a full clinical review of the relevant cases (Exh. 19, ECF No. 27-20, PageID.470), neither she nor nurse Tokarski made any of the original complaints that were substantiated by the Summary Review Board and ultimately led to Plaintiff's termination—those regarding Patients 1, 2 and 3— a fact which Plaintiff's counsel admitted at the motion hearing. Those complaints were made by others, against whom Plaintiff's counsel concedes there to be no "direct or indirect" evidence of discriminatory animus.

Second, Plaintiff cites overwhelmingly to her own testimony regarding Tokarski and Sally Lewis's alleged bias against her. Examples include Plaintiff's deposition testimony that Dr. Albito warned that her skin color made her a target (Exh. 2, pp. 129-130, 160-167, ECF No. 30-3, PageID.752, 757-759), and that nurse Tokarski, who is white, was hostile towards Plaintiff and other people of color (Exh. 2, pp. 97-98, 110, ECF No. 30-3, PageID.745, 747). But personal belief of discrimination, alone, is insufficient to create an inference of discrimination. *Watson v. City of Cleveland*, 202 F. App'x 844, 854 (6th Cir. 2006) ("Watson's personal belief that she and others suffered from adverse employment actions motivated by racial discrimination cannot help Watson avoid

25

summary judgment."). *See also Chappell v. GTE Prods. Corp.*, 803 F.2d 261, 268 (6th Cir. 1986) ("Mere personal beliefs, conjecture and speculation are insufficient to support an inference of age discrimination.").

Finally, Plaintiff fails to provide sufficient evidence of any meaningful connection between alleged discriminatory animus on the part of nurse Tokarski or Sally Lewis and the subject complaints against her, the review of those complaints, including by the SRB, or Dr. Bates's ultimate termination decision. Respiratory therapist Cicinelli filed the Report of Contact for Patient 1. (Exh. 6, ECF No. 27-7, PageID.306, ¶ 14; Exh. 7, Report of Contact, ECF No. 27-8.) With regard to Patient 2, nurse Thompson e-mailed nurse manager Tokarski to complain of Plaintiff's care, but Tokarski simply forwarded the e-mail to Sally Lewis without comment. (Exh. 10, ECF No. 27-11.) For Patient 3, several employees complained of Plaintiff's care—respiratory therapists Cicinelli and Archambault to their supervisor Muhammad, nurse practitioner Little, and nurse Jacobs—but not nurse Tokarski or Sally Lewis. (Exh. 12, ECF No. 27-13; Exh. 13, ECF No. 27-14; Exh. 14, ECF No. 27-15; Exh. 15, ECF No. 27-16.) Thus, although nurse Tokarski and Sally Lewis may have received or been privy to some of the complaints, Plaintiff has presented no evidence beyond her own speculation that they initiated or encouraged them.

26

Sally Lewis did, as Plaintiff asserts, potentially misrepresent or misstate

comments made by Dr. Trimble regarding Patient 3 in her e-mail to Dr. Bates

recommending Plaintiff's suspension pending review of her care of Patients 1, 2,

and 3 (Exh. 19, ECF No. 27-20; Exh. 19, pp. 27-32, ECF No. 30-20, PageID.993-

994), but this fact does not negate the reviews of Plaintiff's patient care conducted

by Dr. Schildhouse or the SRB. Plaintiff also asserts that Sally Lewis provided

biased testimony to the SRB, but the SRB heard testimony from Sally Lewis and

Plaintiff, and reviewed the medical records and other material provided (Exh. 30,

ECF No. 27-31; Exh. 31, ECF No. 27-32; Exh. 33, ECF No. 27-34), which

Plaintiff's counsel also admitted at the motion hearing. And Plaintiff's counsel

conceded that Plaintiff has no evidence of discriminatory animus on the part of the

SRB members. Furthermore, beyond Dr. Bates's reference to Plaintiff as "nasty"

and "belligerent" (Exh. 16, pp. 60-61, 64-65, ECF No. 27-17, PageID.427-429),

language which Plaintiff subjectively considers to be racially charged,[5] Plaintiff

asserts only that the SRB and Dr. Bates, the ultimate decisionmaker, relied upon

discriminatory input from nurse Tokarski and Sally Lewis (ECF No. 30,

---

[5] The Court questioned Plaintiff's counsel on why the adjectives "nasty and belligerent" should be considered "arguably…racially loaded language," or what basis there is for construing the word *nasty* as connoting a racial animus, as opposed to just describing impolite or uncouth behavior. Counsel conceded that there is no basis for a racially charged inference, other than Plaintiff's own subjective belief and her testifying that "that's the way she received the comments."

27

PageID.712).  However, the SRB relied on a full range of evidence.  As described above, Dr. Bates testified that she largely relied on their recommendation for her termination decision, and Plaintiff has failed to present additional evidence of their influence on Dr. Bates's ultimate decision sufficient to create a genuine issue of fact regarding pretext.  In fact, Dr. Bates initiated many levels of review (by employees Dopp and Kathy Lewis, Dr. Albito, and Dr. Schildhouse) before even convening the SRB.  Furthermore, Dr. Albito, who Plaintiff's counsel believes to be a person of color and of Asian origin, like Plaintiff, reviewed the complaints against Plaintiff upon his return from the Philippines and authored a memo, the concluding section of which states, in pertinent part: "Lapses in decision making, not following proper protocols, not listening [to] suggestions and intimidating other staff, put patients at Risk and Jeopardize[d] their safety.  I strongly recommend that this provider be put on Administrative suspension effectively immediately and an Administrative Board Investigation be conducted as soon as possible."  (Exh. 22, pp. 82-84, ECF No. 27-23, PageID.513; Exh. 23, ECF No. 27-24, PageID.550; Exh. 28, ECF No. 27-29.)  For these reasons, the Court should grant summary judgment on Plaintiff's discrimination claim.

### 2.    Plaintiff's retaliation claim

Plaintiff claims Defendant retaliated against her in violation of Title VII because she engaged in protected activity—namely supporting the complaints of

nurse manager Mikailu Sorie and nurses aid Gabriel Mirelez.  (ECF No. 1,

PageID.8-9, ¶¶ 53, 54.)  For the reasons that follow, the Court should also grant

Defendant summary judgment on Plaintiff's retaliation claim.

"As with a Title VII discrimination claim, a Title VII retaliation claim can

be established 'either by introducing direct evidence of retaliation or by proffering

circumstantial evidence that would support an inference of retaliation.'"  *Laster v.*

*City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (quoting *Imwalle v. Reliance*

*Med. Prods., Inc.*, 515 F.3d 531, 538 (6th Cir. 2008)).  As Plaintiff has proffered

only circumstantial evidence, her claim must be analyzed under the *McDonnell*

*Douglas* burden-shifting framework.  *See Laster*, 746 F.3d at 730.

> The elements of a retaliation claim are similar but distinct from
> those of a discrimination claim.  To establish a *prima facie* case of
> retaliation under Title VII, Plaintiff must demonstrate that: "(1) he
> engaged in activity protected by Title VII; (2) his exercise of such
> protected activity was known by the defendant; (3) thereafter, the
> defendant took an action that was 'materially adverse' to the plaintiff;
> (4) a causal connection existed between the protected activity and the
> materially adverse action." *Jones v. Johanns*, 264 Fed.Appx. 463, 466
> (6th Cir. 2007) (citing *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537,
> 542 (6th Cir. 2003)[.]

*Laster*, 746 F.3d at 730.  Retaliation may apply to "not only the filing of formal

discrimination charges with the EEOC, but also complaints to management and

less formal protests of discriminatory employment practices."  *Id*. at 729-30.

The Court should grant summary judgment on Plaintiff's retaliation claim

because, even viewing the evidence in a light most favorable to her, she has failed

to produce evidence sufficient to demonstrate a genuine issue of fact either that she engaged in protected activity or that a causal connection existed between such activity and the suspension of her privileges or termination.

### a.  Protected activity

First, Plaintiff overstates her alleged protected activity.  In her complaint, Plaintiff alleges that she e-mailed Drs. Bates and Albito to advise that Sorie had been discriminated against on the basis of his race and national origin (ECF No. 1, PageID.4, ¶¶ 21-22), but the evidence presented demonstrates that although she referenced Sorie's national origin, she made no claim of race or national origin discrimination in her e-mail, instead stating:

> [Sorie] is a very honest, decent person and very solution oriented, and I have found nothing but professionalism from him.  There is a kind of simplicity about him being raised in a different culture, growing up very poor in a village in Sierra Leone, one of many children of the many wives of his father.  I don't think he even had shoes to wear until he came to the US, sponsored by a family to study.

> Therefore, I was very disturbed to learn that he is being investigated from what I have heard from several people on, "trumped up charges, that he did not do, but because he pissed off people at the top, and now he has been sent down to Urgent Care so Chris Tokarski can break him".  I was shocked, I asked why no one has spoken up, and they say, it is "because they are picking on him now, and they will do it to me next".  These are exactly their words, not mine.  In other words they are afraid of retaliation.  I have also heard that [Sorie] has been at this VA for 16 years, and he has not been involved in inappropriate behavior.  He is an intelligent person with a lot to contribute.  He is a good man.

30

(Exh. 37, ECF No. 27-38, PageID.673.)  And Plaintiff's testimony at her

deposition that she was alluding to national origin discrimination in the e-mail

(Exh. 2, pp. 211-212, ECF No. 30-3, PageID.760), is insufficient to demonstrate a

genuine issue of material fact that she engaged in protected activity.  *See Wasek v.*

*Arrow Energy Servs., Inc.*, 682 F.3d 463, 469 (6th Cir. 2012) ("[I]n order to obtain

Title VII's retaliation protections, Wasek must have had 'a reasonable and good

faith belief' that the harassing acts he was reporting were Title VII violations.'").

With regard to Mirelez, Plaintiff alleges: "In or around December 2017, a

Hispanic nurses-aid named Gabriel Mirelez filed a grievance.  [Plaintiff] supported

Mirelez's grievance, helping Mirelez retain his position.  Lewis and Bates were

aware that [Plaintiff] supported the grievance, as [Plaintiff] wrote to Human

Resources supporting Mirelez's position."  (ECF No. 1, PageID.4, ¶ 23.)  Plaintiff

was interviewed by Human Resources specialist Berghoff regarding Mirelez's

grievance seeking to overturn discipline for failing to set a bed alarm.  However,

the record demonstrates that both Plaintiff and Berghoff agree Mirelez did not raise

discrimination in his grievance (Exhibit 35, Berghoff Decl., ECF No. 27-36,

PageID.666, ¶ 9; Exh. 2, p. 202, ECF No. 27-3, PageID.212), and that Berghoff's

summary of Plaintiff's responses to his interview questions, to which Plaintiff

explicitly made no corrections, did not contain any allegations of discrimination

(Exh. 2, pp. 68-69, ECF No. 27-3, PageID.178-179; Exh. 35, ECF No. 27-36,

PageID.666-667, ¶¶ 9-10; Exhibit 36, Berghoff Summary E-mail, ECF No. 27-37).

*See Wasek*, 682 F.3d at 469.

### b.    Causation

Furthermore, even if Plaintiff has presented sufficient evidence to create a material factual dispute regarding protected activity, the Court should find that she is unable to establish causation. "Title VII retaliation claims 'must be proved according to traditional principles of but-for causation,' which 'requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Laster*, 746 F.3d at 731 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360; 133 S.Ct. 2517; 186 L.Ed.2d 503 (2013)); *see also Hnin v. TOA (USA), LLC*, 751 F.3d 499, 508 (7th Cir. 2014) ("'[R]etaliation claims under Title VII require traditional but-for causation, not a lesser "motivating factor" standard of causation.'") (quoting *Reynolds v. Tangherlini*, 737 F.3d 1093, 1104 (7th Cir. 2013)).

Plaintiff asserts that she

emailed Bates "to let Dr. Bates know that there was discriminatory behavior," even though she was "not saying it directly." Ex. 2 at 211:25-212:11. The evidence, taken in the light most favorable to [Plaintiff], shows that Lewis and Tokarski were aware of [Plaintiff's] protected activity, and retaliatory complaints by nurses, led by Tokarski, escalated following [Plaintiff's] protected activity. The evidence also demonstrates that [Plaintiff's] participation in the investigation of Mirelez's grievance was protected activity.

(ECF No. 30, PageID.713.)  In so doing, she cites to her own deposition testimony that Sally Lewis was aware she supported Mirelez.  (ECF No. 30, PageID.708 (citing Exh. 2, p. 70, ECF No. 30-3, PageID.742).)  However, as described in great detail above, she fails to provide sufficient evidence of any meaningful connection between the alleged discriminatory animus of nurse Tokarski and Sally Lewis and the complaints made against her with regard to Patients 1, 2, and 3, the SRB recommendation, or Dr. Bates's ultimate termination decision.  Nor does she provide evidence of Bates's retaliatory animus, beyond her own assertions, which, regardless, would not negate the independent review of Plaintiff's care conducted by the SRB.  Accordingly, for the same reasons provided above with regard to her discrimination claim, Plaintiff cannot demonstrate a genuine issue of material fact that but for her support of Sorie and Mirelez, she would have maintained her medical privileges and employment.

### 3.  Mitigation

Should the Court agree with my above recommendation, it need not address Defendant's argument that Plaintiff failed to mitigate her damages.  (ECF No. 27, PageID.148.)

### D.  Conclusion

The Court should **GRANT** Defendant's motion for summary judgment (ECF No. 27) and dismiss the case.

### III. PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc*. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to

Objection No. 2," *etc*. If the Court determines that any objections are without

merit, it may rule without awaiting the response.

Dated: July 12, 2021

Anthony P. Patti
UNITED STATES MAGISTRATE JUDGE